Robert L. PRESTON et al., Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 78–1873.

United States Court of Appeals, Seventh Circuit.

Heard Jan. 19, 1979.

Decided April 16, 1979.

---

Hamilton Smith, Chicago, Ill., for plaintiffs-appellants.

Frederick J. Erhardt, Asst. U. S. Atty., Madison, Wis., for defendant-appellee.

Before SWYGERT and CUMMINGS, Circuit Judges, and CROWLEY, District Judge.*

CUMMINGS, Circuit Judge.

Plaintiff Robert L. Preston and 67 other farmers and estates of deceased farmers have sued the United States under the Federal Tort Claims Act (28 U.S.C. § 1346(b)) for damages, claiming that they lost $1,910,057.42 [1] in their dealings with Grain Finance Company, Inc. (Grain Finance) and Farmers Grain Exchange, Inc. (FGX) by reason of negligent and wrongful actions of the United States Department of Agriculture, the Agricultural Marketing Service (AMS) and Commodity Credit Corporation (CCC). As an alternative to damages, plaintiffs sought an accounting.

Defendant filed a motion to dismiss. The following allegations of the complaint must be taken as true for purposes of ruling on that motion: In 1957 Benjamin T. Green secured a Wisconsin license for Grain Finance to operate a public warehouse in Evansville, Wisconsin, and in December 1965, he secured a similar license for FGX to operate a public warehouse at the same location as the Grain Finance warehouse. Green thereafter stored gain for farmers in the Evansville area at that warehouse and issued warehouse receipts in the names of Grain Finance and FGX, commingling all the grain stored by Grain Finance with all the grain stored by FGX.

Beginning in late 1959, the CCC approved the Evansville warehouse facility as a depository for CCC–owned grain. In July 1969, Green obtained CCC approval of the Evansille warehouse not only as a depository for CCC–owned grain but also as a depository for grain acquired in the warehouse by CCC as a result of its loans to farmers. Simultaneously Green and CCC entered into a Uniform Grain Storage Agreement. By virtue of that agreement, farmers with grain on deposit in the Evansville warehouse facility could obtain loans from CCC secured by the grain they deposited there.[2] CCC regularly causes inspections and audits to be made of CCC–approved warehouses to assure that they are safe places for the storage of grain.

According to the plaintiffs, since in order to obtain the favorable CCC loans they were required to store their grain in an approved warehouse, CCC's approval of Green's warehouse effectively invited and encouraged farmers in the Evansville area to store grain in that facility. Because it was known that CCC would cause audits to be made of Grain Finance, plaintiffs were lured to the Evansville warehouse facility, causing them to have dealings with Grain Finance and FGX. Because of its approval of the warehouse, CCC is said to have assumed a duty to plaintiffs to exercise reasonable care in ascertaining whether that warehouse facility was a safe place in which to store grain from the standpoint not only of physical facilities but also from the

---

* Honorable John Powers Crowley, district judge of the Northern District of Illinois, is sitting by designation.

1. There were originally 68 plaintiffs but two did not appeal, thus reducing the *ad damnum* to $1,788,902.28.

2. The CCC, as part of a program to support the prices of agricultural commodities and to control harmful fluctuations in the supply of those commodities, is authorized to give low-interest non-recourse loans to farmers, collateralized by grain deposited by them in CCC–approved warehouses. If the farmer repays the loan and interest he may reclaim his grain. If he does not repay the debt, the CCC takes title to the grain and the farmer's obligation is completely discharged. Thus a farmer has the option of selling the grain to the CCC for the amount of the loan or, if the market is higher later, of reclaiming it and selling it at the market price.

standpoint of economic stability and the integrity of the operator. CCC is said to have a duty to warn plaintiffs if the Evansville facility was not a safe place or if it became a place that was not safe.

In cooperation with CCC, AMS conducted audits of Grain Finance in September 1969, May 1970, December 1970, May 1971, October 1971, May 1972, November 1972, April 1973, August 1973 and August 1974. By conducting those audits, CCC and AMS assertedly assumed a duty to plaintiffs to exercise reasonable care in ascertaining that said warehouse was and continued to be a safe place in which to store grain and to warn them otherwise.

Because of CCC's approval of this warehouse facility, plaintiffs allege that they did increasing amounts of business with Grain Finance and FGX and borrowed money from CCC secured by their grain on deposit there. They also deposited grain in that facility under a variety of arrangements— including simple bailments and price later contracts (see note 3 *infra*)—which did not involve CCC loans. In November 1972, at Green's request, CCC withdrew its approval of his warehouse so that after that date CCC loans were no longer available for grain stored there. However, AMS continued to audit the facility which still contained grain which was owned by CCC or which was collateral for CCC loans. Plaintiffs continued to do business with Grain Finance and FGX until November 14, 1974, when a state court receiver was appointed for those companies.

According to plaintiffs, when CCC approval was granted to this warehouse facility in July 1969 and when the Uniform Grain Storage Agreement was entered into between Green and the CCC effective that month, Grain Finance and FGX had serious financial difficulties and were bankrupt, so that their warehouse facility was not a safe place in which to store grain.

After July 1969, Grain Finance and FGX assertedly sold some grain which was owned by these farmers or by CCC and covered by warehouse receipts. Plaintiffs also alleged:

"Some of the grain which they [Grain Finance and FGX] sold, they had no right to sell because, although it was the subject of price later contracts, the sales were not made pursuant to the price later contracts [with plaintiffs], but by way of converting the grain, and the proceeds from the sale of the grain, to their own use" (App. 11).

Green, Grain Finance and FGX after 1969 allegedly used the same grain twice—to represent purchases and obligations of both of the legally separate but physically integrated firms—in order to distort audits of their books. There was a growing disparity between the grain they had on hand and the grain they needed to meet their obligations. FGX filed a bankruptcy petition in September 1974, and Grain Finance did so in February 1975.

Plaintiffs claim they were injured by the following wrongful acts of defendant and its agencies:

1. CCC failed to ascertain that Grain Finance and FGX had serious financial difficulties or were bankrupt when it approved their warehouse facility as a depository.

2. CCC failed to warn plaintiffs that Grain Finance and FGX had serious financial difficulties or were bankrupt at the time CCC approved the warehouse.

3. CCC audits of Grain Finance should have included audits of FGX and should have considered the obligations of both entities with respect to grain which was subject to price later contracts.[3]

4. CCC should have notified plaintiffs of grain shortages found at Grain Finance in November 1972 and of the termination of the Uniform Grain Storage Agreement between Grain Finance and CCC later that month.

---

**3.** Under price later contracts some of the grain deposited by some of the plaintiffs with Grain Finance and FGX was purchased by those companies subject to agreements to pay the market price for it at a future date. An example of such a contract appears at defendant's appendix A4–A5.

5. CCC should have warned plaintiffs of grain shortages discovered at Grain Finance in August 1973.

6. In November 1972, CCC did not warn plaintiffs of Grain Finance's and FGX's desperate financial condition, so that CCC could convert to its own use grain in the warehouse in which plaintiffs had an interest.

7. After November 1972, CCC converted to its own use grain deposited by plaintiffs in the Evansville warehouse.

8. Because of CCC's negligence before November 1972 and its intentionally wrongful conduct after November 1972 plaintiffs continued to store grain at the Evansville warehouse facility until a receiver was appointed in November 1974.

The complaint next asserted that plaintiffs and CCC owned all the grain deposited in the Evansville warehouse on November 14, 1972. From November 1972 until November 1974, CCC had Grain Finance ship grain to CCC even though most of the grain had been deposited there by plaintiffs, much of it after the termination of the Uniform Grain Storage Agreement.

The complaint closed with a statement that plaintiffs did not learn that this warehouse was not a safe place in which to store grain until November 14, 1974. Therefore, in June and August 1976, plaintiffs filed damage claims with the Department of Agriculture, which denied them in December 1976.

Fourteen months after the complaint was filed, defendant filed a motion to dismiss, asserting that (1) the action was barred by the two-year statute of limitations contained in 28 U.S.C. § 2401(b), (2) there was no actionable duty on the part of the United States to the plaintiffs, (3) the discretionary function exception of the Federal Tort Claims Act (28 U.S.C. § 2680(a)) was applicable, (4) the misrepresentation or deceit exception of the Tort Claims Act (28 U.S.C. § 2680(h)) was applicable, and (5) the plaintiffs did not have title to the property as required by the applicable regulation contained in 28 C.F.R. § 14.3.[4] Finally, according to the motion to dismiss, the district court had no jurisdiction over the claims of 43 plaintiffs since the damages they sought in the complaint exceeded the amount of their administrative claims.[5]

Fourteen months later, the district court filed an opinion and order granting the Government's motion to dismiss the suit. Judge Doyle concluded that on analysis the complaint was essentially an action for misrepresentation or deception and therefore within the following exception contained in the Tort Claims Act (28 U.S.C. § 2680(h)):

"Any claim arising out of * * * misrepresentation [or] deceit * * *."

He also held that a defendant inviter has no duty to invitees with respect to "economic losses sustained by persons who deposit their tangible goods, such as grain, in a physical facility, such as a warehouse" (App. 52).[6] The court made no ruling with respect to plaintiffs' claim of conversion of their grain. We affirm except with respect to conversion.

### The Misrepresentation or Deceit Exception in the Federal Tort Claims Act Bars Part of the Complaint.

As already noted, the Federal Tort Claims Act excepts from Government liability "any claim arising out of * * * misrepresentation [or] deceit * * *" (28

---

**4.** While the Tort Claims Act permits "claimants" to sue the Government, it also requires such claims to be presented first to a federal agency. 28 U.S.C. § 2675(a) and (b). Applicable regulations provide that administrative claims for injury to or loss of property are to be filed by "the owner of the property, his duly authorized agent or legal representative" (28 C.F.R. § 14.3).

**5.** This last defense was supported by the U.S. Attorney's affidavit showing that 43 named plaintiffs had filed lesser administrative claims than the damages they sought in the district court complaint.

**6.** Judge Doyle added that "the allegations of the complaint fail to place the defendant, with respect to the warehouses, in the position of an inviter with respect to a physical facility to which an invitee has been invited and upon or within which the invitee has suffered physical injury" (App. 52).

U.S.C. § 2680(h)). The district court relied exclusively on this exception in dismissing this action. Under *United States v. Neustadt,* 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614, this decision was correct insofar as the complaint relies upon the CCC's breach of any duty supposedly owed by the Government to plaintiffs. In *Neustadt* the purchasers of residential property were furnished a statement reporting the results of an inaccurate Federal Housing Administration inspection and appraisal and, relying thereon, were induced by the sellers to pay a purchase price in excess of the property's fair market value. As here, the Neustadts complained of defendant's negligence and alleged that the Government owed a duty to them and negligently performed that duty, thus entitling plaintiffs to recover. But with only Justice Douglas dissenting,[7] the Supreme Court held that

> "the [Government's] duty to use due care in obtaining and communicating information upon which that party may reasonably be expected to rely in the conduct of his economic affairs, is only to state the traditional and commonly understood legal definition of the tort of 'negligent misrepresentation'" (366 U.S. at 706, 81 S.Ct. at 1300).

Therefore the lawsuit fell within the misrepresentation exception in Section 2680(h). 366 U.S. at 706–707, 81 S.Ct. 1294. The Court specifically held that both negligent and wilful misrepresentations come within the exception. *Id.* at 702, 81 S.Ct. 1294. Furthermore, the Court concluded that Congress intended the misrepresentation exception to the Tort Claims Act to apply even where the Government owed claimants a specific duty to make and communicate accurate information to them. Indeed the *Neustadt* Court did not confine its holding to the Federal Housing Administration situation involved but ruled that the misrepresentation exception applies to

> "numerous instances in which Congress has relegated to a governmental agency the duty either to disclose directly, or to

require private persons to disclose, information for the assistance and guidance of other persons in the conduct of their economic and commercial affairs" (366 U.S. at 710, 81 S.Ct. at 1302).

In addition to *Neustadt,* this case is controlled by our decision in *Redmond v. United States,* 518 F.2d 811 (7th Cir. 1975), where Redmond sought $8,000,000 from the United States on the ground that its employees breached their duty to warn him that he was in imminent danger of becoming a financial victim of one Edward Wuensche's criminal propensities. Applying *Neustadt,* we held this wrong to be nonactionable by virtue of the misrepresentation exception of Section 2680(h). Although the *Redmond* Court also stated that how best to fulfill a government duty is wholly within the discretion of its officers, thus triggering the discretionary function exception of the Tort Claims Act (28 U.S.C. § 2680(a)),[8] we need not consider that exception in view of the applicability of the misrepresentation or deceit exception.

To avoid *Neustadt,* plaintiffs rely primarily on *Indian Towing Company v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, but that case did not involve the misrepresentation or deceit exception of the Tort Claims Act, and therefore was distinguished in *Neustadt.* 366 U.S. at 711, 81 S.Ct. 1294. The *Indian Towing* case involved property damages suffered when a vessel ran aground because of the Coast Guard's negligent failure to maintain a light in the lighthouse it operated or to warn that the light was out. Plaintiffs seek to bring their case within the *Indian Towing* doctrine by characterizing it as not an action for misrepresentation but for negligent operations (here negligently performed audits) coupled with a negligent or intentional failure to warn.

█ It is not unusual for these and other plaintiffs to describe their cause of action in a way calculated to avoid the misrepresentation exception, but the courts have con-

---

7. Justice Douglas dissented without opinion (366 U.S. at 711, 81 S.Ct. at 1302). Justice Stewart did not participate.

8. 518 F.2d at 816–817.

sistently looked behind the plaintiff's characterization. *Redmond, supra,* at 814; *Fitch v. United States,* 513 F.2d 1013, 1015 (6th Cir. 1975); *Hall v. United States,* 274 F.2d 69, 71 (10th Cir. 1959). On analysis, we think it clear that what plaintiffs are complaining about is an implied misrepresentation. They have alleged that the approval and subsequent auditing of the warehouse by government agencies created an aura that the warehouse was safe, and that they relied to their detriment on this apparent approval by the government agencies. As in *Redmond, supra,* this amounts to an allegation of misrepresentation by implication.

Plaintiffs note in addition that failure to warn in circumstances where the plaintiff alleges reliance on the lack of warning[9] has also been recognized as a form of misrepresentation, but one that does not fall within the exclusion of Section 2680(h). In this regard they rely on *Wenninger v. United States,* 234 F.Supp. 499, 505 (D.Del.1964), and *Ingham v. Eastern Air Lines, Inc.,* 373 F.2d 227 (2d Cir. 1967), certiorari denied, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292. Plaintiffs' attempt to analogize their case to those cited is misleading, however, since the failure to warn was not the only misrepresentation involved in this case. The failure to warn cases relied upon by plaintiffs fall within that category of cases, like *Indian Towing,* about which the Supreme Court made the following comment:

"Such a claim does not 'arise out of * * misrepresentation,' any more than does one based upon a motor vehicle operator's negligence in giving a misleading turn signal. As Dean Prosser has observed, many familiar forms of negligent conduct may be said to involve an element of 'misrepresentation,' in the generic sense of that word, but '[s]o far as misrepresentation has been treated as giving rise in and of itself to a distinct cause of action in tort, it has been identified with the common law action of deceit,' and has been confined 'very largely to the invasion of interests of a financial or commercial character, in the course of business dealings.'" 366 U.S. at 711, n. 26, 81 S.Ct. at 1302.

Just as some causes of action founded on a traditional negligence theory will also involve an element of misrepresentation, it is equally clear that an action based on negligent misrepresentation may involve underlying negligent conduct which gave rise to the misrepresentation. In *Neustadt,* it was a negligent inspection which caused the misleading appraisal. In the present case, there allegedly were negligent audits which caused the misleading aura of safety.

It is therefore necessary to distinguish those causes of action for independent torts that only collaterally involve misrepresentations from those, like the present one, which are fundamentally grounded on the common law tort of misrepresentation. In making these determinations, the courts have followed *Neustadt*'s distinction between personal injury or property damages arising from negligent performance of operational tasks on the one hand and injury resulting from commercial decisions taken in reliance on governmental misrepresentation on the other. In the former category are the cases dealing with plane crashes caused by negligent performance of air traffic control tasks. *Wenninger v. United States, supra; Ingham v. Eastern Air Lines, Inc., supra; Dickens v. United States,* 545 F.2d 886 (5th Cir. 1977); *Yates v. United States,* 497 F.2d 878 (10th Cir. 1974); *Hartz v. United States,* 387 F.2d 870 (5th Cir. 1968). In those cases the only "misrepresentation" was the failure to warn and this was—as it was in *Indian Towing*—only collateral to the independent tort that caused the physical damage.

In the present case the alleged tort was the implied misrepresentation that the

9. Defendant has, as noted, asserted that it had no duty to the plaintiffs, relying on *Clemente v. United States,* 567 F.2d 1140 (1st Cir. 1977), certiorari denied, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388. We do not reach the issue of whether defendant owed a duty to the plaintiffs since we hold that even if it did, this action cannot be wholly maintained because of the misrepresentation exclusion.

warehouse was safe. In similar cases of injury resulting from reliance on governmental evaluations, the courts have consistently and correctly applied *Neustadt* to hold that the misrepresentation exclusion applies. *Irick v. United States* (No. 75–1824, 4th Cir. March 2, 1976); *Scanwell Laboratories v. Thomas,* 172 U.S.App.D.C. 281, 521 F.2d 941 (1975); *Fitch v. United States,* 513 F.2d 1017 (6th Cir. 1975) and cases cited at 1016, n. 2; *Summers v. United States,* 510 F.2d 223 (8th Cir. 1975); *Moon v. Takisaki,* 501 F.2d 389 (9th Cir. 1974); *United States v. Longo,* 464 F.2d 913 (8th Cir. 1972); *Thompson v. United States,* 408 F.2d 1075 (8th Cir. 1969); *Smith v. United States,* 333 F.2d 70 (10th Cir. 1964). The test is not whether the injury was economic, but whether it resulted from a commercial decision based on a governmental misrepresentation. Thus in *Irick v. United States, supra,* the plaintiff bought a home subsidized by the Department of Housing and Urban Development (HUD). It was HUD's practice to inspect the homes involved in the subsidy program and plaintiff allegedly relied on this practice as an implied representation that the house was safe. The house burned down due to faulty wiring which a non-negligent inspection allegedly would have revealed, causing the death of plaintiff's two daughters. His wrongful death action was dismissed on the basis of *Neustadt.*

A recent Ninth Circuit *en banc* decision overruling earlier cases which had held misdiagnosis of medical conditions to be within the misrepresentation exception is consistent with the distinction made in *Neustadt* and followed in the previously cited cases. In *Ramirez v. United States,* 567 F.2d 854 (9th Cir. 1977) (*en banc*), the court held that failure to obtain informed consent to a surgical procedure was actionable under the Federal Tort Claims Act even though it was predicated on a misrepresentation of the risks involved. The decision was based on the dual grounds that failure to obtain informed consent constituted the independent tort of medical malpractice and that the decision to undergo surgery was not a commercial one. Although relied upon by plaintiffs, *Ramirez* is consistent with our disposition of their case. Theirs was a commercial decision and there is no suggestion that apart from the implied misrepresentation the allegedly negligent audits would have constituted a tort.[10]

Since the gravamen of the complaint is an implied misrepresentation which was relied upon in making a business decision, Judge Doyle correctly concluded that the misrepresentation or deceit exception applied.[11]

### Defendant's Liability for Conversion.

■ The alternative theory of the complaint is that the Government converted plaintiffs' grain by directing Green to ship grain held in the Evansville warehouse until CCC's obligations were satisfied. Grain thus shipped to the CCC included plaintiffs' grain, some of which was deposited in the warehouse after the CCC had withdrawn its approval. This grain allegedly was taken by the CCC "with a view to recoup [the CCC's] losses at the expense of" plaintiffs (App. 19). The conversion allegedly took place between November 1972 and November 1974. The district court did not discuss defendant's alleged conversion in its opinion

---

**10.** Our own research revealed the additional case of *Matthews v. United States,* 456 F.2d 395 (5th Cir. 1972), in which a claim based on misinformation furnished by members of the Air Force legal staff caused a personal injury plaintiff to forfeit a cause of action through noncompliance with the statute of limitations. The Fifth Circuit reversed the district court's dismissal of the tort claim, remanding for development of whether the plaintiff had stated a claim for legal malpractice. Since malpractice is a tort independent of common law misrepresentation and since the plaintiff was not com-

plaining about having based a business decision on the wrong advice, *Matthews* is not inconsistent with *Neustadt* or our decision in this case.

**11.** Because of the applicability of the misrepresentation or deceit exception, plaintiffs' state court cases with respect to landowners' duty to protect invitees from physical injuries are useless. As the district court observed, they do not apply to economic injuries anyway (App. 52).

dismissing the complaint. If the CCC did convert grain belonging to plaintiffs, they are of course entitled to damages under the Tort Claims Act.

 Defendant asserts that plaintiffs cannot recover for conversion because under the price later contracts involving some of the plaintiffs (n. 3 *supra*), they lacked sufficient title to prevail. However, this record does not show which plaintiffs, if any, lacked sufficient title to prevail on their conversion theory.[12] Also, some plaintiffs apparently had grain stored at the warehouse pursuant to two different kinds of contract—price later contracts and simple bailment contracts. Even if they lack sufficient title to prevail on a conversion theory for the grain subject to the price later contracts, they are entitled to a recovery for any bailed grain that was converted. While defendant asserts that the two-year statute of limitations contained in 28 U.S.C. § 2401(b) bars recovery, that provision bars tort claims against the United States unless they are "presented in writing to the appropriate Federal agency within two years after such claim accrues." The complaint alleges that plaintiffs were first aware that this warehouse facility was not a safe place to store grain "shortly before November 14, 1974" (App. 43). All but 12 plaintiffs filed the requisite claims with the Department of Agriculture on June 9, 1976, and the remaining 12 filed their administrative claims on August 6, 1976. Taking these allegations as true, all claims were presented in writing to the Government within two years after their accrual, so that the two-year statute of limitations contained in 28 U.S.C. § 2401(b) does not bar this action. Of course, on remand, the defendant may be able to show that plaintiffs or some of them knew (or should have known) of the conversion more than two years before they filed their claims with the Department of Agriculture and that at least some of them lacked sufficient title to prevail in a conversion action.

 Finally, the defendant points out that the amounts now claimed as damages by some of the plaintiffs exceed the amounts claimed in their administrative action. This will not bar their suit since their complaint clearly indicates that the administrative claims were for the same damage alleged here (App. 23). However, if the trier of fact concludes that plaintiffs are entitled to recover, the discrepancy in amounts claimed can be taken into consideration.

Affirmed in part; reversed and remanded in part for further proceedings consistent herewith.

---

12. The defendant submitted a decision by a bankruptcy judge in which he held that farmers with grain subject to price later contracts did not have title, so that they were not entitled to share in the proceeds resulting from the sale of the grain by the trustee. This decision, of course, is not determinative of whether they could prevail on a common law conversion theory. On reconsideration, the bankruptcy judge reaffirmed his earlier decision but noted that he had not considered or dealt with "the rights the producers may have against other parties" (Defendant's App. A11).