**GENERAL PUBLIC UTILITIES CORPORATION, Jersey Central Power & Light Company, Metropolitan Edison Company, Pennsylvania Electric Company**

v.

**UNITED STATES of America.**

Civ. A. No. 81–4950.

United States District Court,
E.D. Pennsylvania.

Nov. 24, 1982.

David Klingsberg, James B. Liberman, New York City, Samuel B. Russell, Allen Seltzer, Reading, Pa., for plaintiffs.

James P. Klapps, Asst. Director, Torts Branch, J. Paul McGrath, Asst. Atty. Gen., Civ. Div., Dept. of Justice, K. Roxanne McKee, Trial Atty., Torts Branch, Civ. Div., Dept. Justice, James A. Fitzgerald, Acting Sol., Michael B. Blume, Atty., Nuclear Regulatory Com'n, Washington, D.C., Peter F. Vaira, Jr., U.S. Attorney, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

### Background

In the early morning hours of March 28, 1979, a turbine generator at plaintiffs'[1] Three Mile Island Unit 2 nuclear facility (TMI), designed by Babcock & Wilcox (B & W), experienced a shutdown "trip" due to a loss of feedwater. Subsequently, a rapid heat buildup raised the pressure in the reactor coolant system and caused a pilot-operated relief valve to open, thereby relieving excess pressure. Shortly thereafter, the re-

---

1. Plaintiff, General Public Utilities Corp. (GPU), is an investor-owned public utility holding company operating pursuant to the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79. GPU owns all the common stock of its co-plaintiffs, Jersey Central Power & Light Company (JCP & L), Metropolitan Edison Company (Met Ed), and Pennsylvania Electric Company (Penelec). For the sake of clarity, these parties will simply be referred to as "plaintiffs".

actor shut down and pressure in its coolant system dropped to within the normal range; the pilot-operated relief valve should have closed. It failed to do so. Worse, the instrumentation designed to indicate the true position of the relief valve also failed; it incorrectly indicated that the valve was closed when, in fact, it was open.

Thereafter, a "loss-of-coolant accident" occurred; significant quantities of coolant water and steam were lost through the malfunctioning valve. As a result thereof, pressure in the reactor coolant system continued to drop and coolant water and steam escaped. Within a few minutes of the original "trip", the engineered safety system began high-pressure injection of water into the reactor coolant system.

Continued monitoring by plant operators incorrectly lead them to believe that the facility was "going solid"; i.e., that the pressurizer was dangerously close to filling with water. Following B & W generated and Nuclear Regulatory Commission (NRC) approved procedures, and attempting to guard against this eventuality, TMI operators reduced the high pressure injection of water into the coolant system and initiated maximum let-down of coolant. The reduction of high-pressure coolant injection exasperated the developing problem; i.e., coolant which escaped through the malfunctioning valve was not replaced.

Within one or two hours of the original "trip", TMI operators, again acting pursuant to B & W established and NRC approved procedures, shut down the plant's four reactor coolant pumps which normally circulate coolant through the reactor vessel. Once this occurred, the reactor vessel was deprived of the coolant water and steam which had previously circulated through it, the nuclear core began to uncover and it, along with the protective cladding, was severely damaged. Radioactive material

from the damaged core spread throughout the building and adjacent structures. As a result, the public was exposed to catastrophic dangers. The resulting damage to plaintiffs is allegedly in excess of four billion dollars.

The complaint further alleges that eighteen months earlier, on September 24, 1977, a "loss-of-coolant" accident occurred at the Davis-Besse nuclear power plant designed by B & W and operated by Toledo Edison Company. Importantly, the accident at Davis-Besse closely paralleled the events which later occurred at TMI. The ultimate consequences of terminating high pressure injection at Davis-Besse were, however, severely mitigated by the fact that the Ohio plant was only operating at 9% capacity at the time of its accident. TMI, by contrast, was operating at 97% capacity.

Plaintiffs assert that the NRC failed to properly disseminate information to them regarding the cause of the Davis-Besse accident and also the corrective measures subsequently developed to prevent similar accidents. Moreover, plaintiffs complain that the NRC negligently approved the TMI construction plans, containing the faulty pilot-operated relief valve at a time when it knew, or should have known, that the valve could stick and cause a "loss-of-coolant" accident.

The two-count complaint seeks recompense in Count I for the purported failure of defendant, United States, acting through its agent, the NRC to properly warn and advise plaintiffs of existing hazards and defects in their plant. Count II inveighs against the NRC's purported negligent approval of B & W's emergency procedures. Specifically, the complaint asserts three grounds for relief: breach of the Good Samaritan duty[2], negligence, and negligence *per se.*

2. *See,* Restatement of Torts (2d) which provides:

§ 324 A. Liability to Third Person for Negligent Performance of Undertaking
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for

the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
(a) his failure to exercise reasonable care increases the risk of such harm, or

■ Jurisdiction is predicated upon the Federal Tort Claims Act, 28 U.S.C. § 1346(b)[3] (FTCA), which generally imposes governmental liability, *inter alia,* "under circumstances where the United States, if a private person, would be liable". Resolution of the Government's motion to dismiss[4] requires construction of two important exceptions to the general abrogation of sovereign immunity contained in the FTCA. The "misrepresentation exception", 28 U.S.C. § 2680(h), prevents the imposition of governmental liability on any claim arising out of, *inter alia,* a "misrepresentation". The "discretionary function" exemption, 28 U.S.C. § 2680(a), shields governmental conduct from liability where the claim is grounded in "the failure to exercise or perform a discretionary function or duty". It applies even where there is an abuse of discretion. *Dalehite v. United States,* 346 U.S. 15, 33–36, 73 S.Ct. 956, 966–68, 97 L.Ed. 1427 (1955).

### The Government's Duty

Plaintiffs asseverate that the NRC breached its duty to warn of design hazards when it failed to employ either of the two primary methods which it uses to provide licensees with safety information. The first is the issuance of an "IE Bulletin". When the NRC determines that a specified event may have "generic" applicability, it issues an IE Bulletin in order to "achieve appropriate precautionary or corrective action" by nuclear licensees and operators. 10 CFR § 1.64. The NRC also requires that all IE Bulletins be responded to so that it, the NRC, may "assess [ ] the situation". *See, U.S. Nuclear Regulatory Commission, Office of Inspection and Enforcement, Inspection and Enforcement Manual* (Manual), Chapter 1100, MC 1125–031. The second mode of NRC licensee notification is the distribution of "Circulars". These are designed simply to "inform the licensee or permit holder" of issues regarding "safety,

(b) he has undertaken to perform a duty owed by the other to the third person, or
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
This method of imposing liability is recognized by federal courts as the law of Pennsylvania, *Evans v. Liberty Mutual Insurance Co.,* 398 F.2d 665 (3d Cir.1968) and may be used by plaintiffs to affix governmental liability in a Federal Tort Claims Act suit. *Toppi v. United States,* 327 F.Supp. 1277 (E.D.Pa.1971). *See also, Blessing v. United States,* 447 F.Supp. 1160 (E.D.Pa.1978). Additionally, Pennsylvania recognizes negligent inspection as an actionable tort. *Mays v. Liberty Mutual Ins. Co.,* 323 F.2d 174 (3d Cir.1963); *Evans v. Otis Elevator Co.,* 403 Pa. 13, 168 A.2d 573 (1961). Most recently, § 324A and its companion, § 323 of the Restatement of Torts (2nd), were applied to a claim arising out of a maritime accident brought under the Suits in Admiralty Act, 46 U.S.C. § 742. *See, Patentas v. United States,* 687 F.2d 707 (3d Cir.1982).
§ 323 of the Restatement provides:
Negligent Performance of Undertaking to Render Services.
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking.

**3.** 28 U.S.C. § 1346(b) provides that
[s]ubject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

**4.** Fed.R.Civ.P. 12(b)(1) and (6). For present purposes we assume the veracity of plaintiffs' factual allegations. *Walker Processing Equipment Co. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). We do not, of course, accord this same deference to the conclusions of law contained in the complaint. *Frederiksen v. Poloway,* 637 F.2d 1147, 1150 n. 1 (7th Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981).

safeguards, or environmental interest". *Id.* at MC1125–032. Importantly, Circulars do not require a licensee's response to the NRC; they generally signify a lesser degree of "danger" than does an IE Bulletin.

The final information gathering and dissemination function which the NRC performs is the compilation and submission of "abnormal occurrence" reports to the Congress. An "abnormal occurrence" is defined as, *inter alia,* a "major deficiency in design, construction, use of, or management" of a licensed nuclear facility. *See,* Energy Reorganization Act of 1974, (Energy Act) § 208, 42 U.S.C. § 5848. Importantly, plaintiff asserts that it is among the intended beneficiaries of the NRC's statutory obligation.

In any event, after the Davis-Besse accident, the NRC neither distributed an IE Bulletin, Circular, nor issued an abnormal occurrence report to the Congress. (Plaintiffs do not, however, contest defendants' assertion that they received a Licensee Event Report, issued by the Office of Resource Management, NRC, regarding the Davis-Besse accident.) Rather than issue any warning, the Government approved plaintiffs' construction plans; this notwithstanding the fact that they called for inclusion of the faulty pilot-operated relief valve. Plaintiffs contend that their license issuance, which authorized them to operate an incorrectly designed plant, and the failure to widely disseminate corrective measures designed after Davis-Besse, violated defendant's duty to monitor the nuclear power industry and to warn licensees of dangerous practices and conditions.

Before turning to issues raised by the misrepresentation and discretionary function exceptions, the Government argues a very basic tort concept: that the NRC owes no duty to plaintiffs or the nuclear power industry. Defendant asserts that the myriad of regulatory activities and standards promulgated by the NRC simply describe minimal safety standards to which the industry must adhere. Moreover, defendant argues that all of these regulations are designed to and, in fact, inure only to the benefit of the public. An evaluation of the relevant statutes, regulations and legislative history establishes, however, that the relationship between the NRC and the nuclear industry contains elements of symbiosis, which *may* form the predicate for imposing liability.

■ Specifically, the Government's statutory and regulatory obligations imposed by §§ 206 and 208 of the Energy Act, 42 U.S.C. §§ 5846 and 5848, and the regulations promulgated thereunder, create a duty on behalf of the Government to properly and carefully regulate, monitor and warn the nuclear power industry of existing dangers.

For example, § 206 of the Energy Act, 42 U.S.C. § 5846(a)(2), requires nuclear plant operators to notify the NRC of any plant "defect" which rises to the level of a "substantial safety hazard". Moreover, § 208 of the Energy Act, 42 U.S.C. § 5848, directs the NRC to prepare quarterly Congressional reports listing "abnormal occurrences" at nuclear facilities. Additionally, the NRC is charged with providing "wide dissemination" of "abnormal occurrence" reports.

■ Because the legislative history of the Energy Act cross references §§ 206 and 208, 42 U.S.C. §§ 5846 and 5848, the reports of defects made to the Commission pursuant to § 206 inure to the benefit of electric utilities. These same reports frequently form the basis of the Commission's Congressional "abnormal occurrence" reports, mandated by § 208 of the Energy Act and receive industry-wide dissemination. Hence, plaintiffs are one of the intended beneficiaries of those statutory provisions.

The fact that §§ 206 and 208, 42 U.S.C. §§ 5846 and 5848, run to plaintiffs' benefit finds support in the legislative history of the Energy Act as well. Specifically, S.Rep. No. 980, 93rd Cong., 2d Sess. *reprinted* in 1974 U.S.Code Cong. & Admin.News 5470, 5527–28, demonstrates that Congress "intended" the obligation of licensees to report safety defects to the appropriate governmental authorities to benefit "electric utilities in particular". The Senate re-

port noted that valves were "the most frequent components involved in abnormal occurrences . . . the breakdown of a valve has potentially catastrophic implications". *Id.* Continuing, the report virtually predicated many of the events which were to occur at TMI and observed that

> [t]he system most frequently involved in abnormal occurrences . . . was the primary cooling system, which is used to prevent a meltdown of the nuclear core of a reactor. The system next most frequently affected by defects . . . was the emergency core cooling system, which prevents a meltdown in case the primary cooling system fails. A meltdown is the worst conceivable reactor accident; such an accident could result in breaching of the containment vessel of a powerplant and in the release of radioactive fallout equivalent to many Hiroshima bombs.

*Id.* The report finally notes that the combined effect of industry reporting safety defects to the Government, 42 U.S.C. § 5846, and the requirement that the Commission report "abnormal occurrences" to the Congress on a quarterly basis, 42 U.S.C. § 5848, will "substantially upgrade the Federal response to defects in all licensed nuclear facilities". 1974 U.S.Code Cong. & Admin.News at 5528. Upon signing the Energy Act, President Ford echoed a similar sentiment and observed that the NRC will be "fully empowered to see to it that reactors using nuclear materials will be properly [ ] designed [and] constructed". Presidential Documents: Gerald R. Ford, Vol. 10; Number 41, p. 1271, 1273 (October 11, 1974).

Two particularly important regulations promulgated pursuant to the Energy Act also merit consideration. As noted, *infra,* 10 CFR § 1.64 requires the Office of Inspection and Enforcement to "notify licensees regarding *generic* problems so as to achieve appropriate precautionary or corrective actions". (emphasis added). Plaintiffs' contention is, of course, that the defect which existed at Davis-Besse was improperly designed into their plant and was "generic" in nature. Further, that the NRC not only failed to disseminate "appro-

priate precautionary or corrective actions", *Id.,* but also it *approved* TMI's plans notwithstanding the fact that they contained a "generic problem".

■ The NRC's duty to monitor the industry and warn of safety problems does not, however, amount to a *guarantee* of plant safety. Far from it. 10 CFR 60, App. B, clearly specifies that although the licensee may delegate its obligation to establish and execute quality assurance programs, the licensee nevertheless "shall retain responsibility therefor". *Id.*

Accordingly, we conclude that the Act's plain language, legislative history, and regulations, support plaintiffs' assertion that the NRC has undertaken *some* duty to carefully monitor nuclear experiences and to disseminate appropriate warnings. Moreover, this duty runs, *inter alia,* to the nuclear power industry. *See also, Regulation of Nuclear Power Reactors and Related Facilities,* 16 Atomic Energy Law Journal 256 (1974).

### Application of the Federal Tort Claims Act

■ The existence and alleged breach of the duty does not, however, end our inquiry. If the purported breach occurred through a misrepresentation or the exercise of discretion, suit is nevertheless barred. As such, the mere breach of a duty may be an insufficient predicate to impose liability. *United States v. Neustadt,* 366 U.S. 696 at 710–11, 81 S.Ct. 1294 at 1302, 6 L.Ed.2d 614; *Green v. United States,* 629 F.2d 581, 584 (9th Cir.1980) ("[T]he existence of a duty on the part of the Government to provide information to plaintiffs [does not] render the [misrepresentation] exception inapplicable"); *Preston v. United States,* 596 F.2d 232, 238 n. 9 (7th Cir.), *cert. denied,* 444 U.S. 915, 100 S.Ct. 228, 62 L.Ed.2d 169 (1979) (where the breach of an existing duty occurs through a misrepresentation, suit is barred.) *Accord, Cross Brothers Meat Packers, Inc. v. United States,* 533 F.Supp. 1319, 1323 (E.D.Pa. 1982).

### Misrepresentation Exception

We now turn to the "misrepresentation" exception. Plaintiffs contend that the governmental duty owed to them was breached by the NRC's negligent failure to properly perform its undertaking of nuclear plant inspection, licensing and distribution of supplemental safety notices. The NRC, on the other hand, characterizes the complaint as alleging only a negligent misrepresentation; i.e., by failing to warn when there was a duty to do so, it misrepresented to plaintiffs the fact that the plant was safe when, in reality, it was not.

The FTCA's "misrepresentation exception" includes a jurisdictional prohibition against suits for "negligent misrepresentation". *United States v. Neustadt,* 366 U.S. at 706–07, 81 S.Ct. at 1300. Additionally, the Supreme Court has cautioned that our inquiry necessitates "looking beyond the literal meaning" of the complaint to determine the "real" cause of action. *Id.* at 703, 81 S.Ct. at 1298. This frequently "decisive and difficult" task requires separating cases of "true negligence" from those of "misrepresentation in negligence's clothing".[5] *Cross Brothers Meat Packers v. United States,* 537 F.Supp. 204 at 205 (E.D.Pa.1982) (denying motion to reconsider).

The initial issue then becomes one of characterization. Does the complaint at bar sound in "negligent misrepresentation" or "negligence"? The inquiry is a difficult one and conflicts between decided cases are not subject to facile resolution.

Two Supreme Court cases highlight the conflicting lines of authority. *United States v. Neustadt, supra,* and *Indian Towing v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

*Neustadt* involved a couple who obtained FHA mortgage approval prior to the purchase of their home. Specifically, defendant therein, the FHA, approved the mortgage application for $24,000. Structural damage manifested itself shortly after plaintiffs closed on the house. Plaintiffs, claiming that they relied upon the FHA's valuation of the house when they prepared their offer, sued for the difference between the FHA's appraised value and the house's fair market value.

The Supreme Court held that the FHA negligently misrepresented the house's value to plaintiffs, but that the suit was barred by the misrepresentation exception. The Court also observed that the FTCA's misrepresentation exception generally governs governmentally transmitted "information for the assistance and guidance of other persons in the conduct of their economic and commercial affairs", and is confined "very largely to the invasion of interests of a financial or commercial character in the course of business dealings". 366 U.S. at 710 and 711 and n. 26, 81 S.Ct. at 1302 and n. 26.

In *Indian Towing, supra,* the Coast Guard undertook to operate a lighthouse off the Louisiana coast. Having assumed "operational control" of the lighthouse, the Coast Guard failed to properly maintain it. The court held that once the Government had undertaken control of the lighthouse it was then obligated to maintain it in proper working order. The negligent failure to properly do so provided a liability-creating predicate.

The parallel between the case at bar and *Neustadt* and *Indian Towing* is obvious. Plaintiffs contend that the NRC's statutory and actual assumption of the duty to in-

---

**5.** Interestingly, plaintiffs have a suit currently pending against B & W, the plant designers. The allegations there track the ones at bar and complain generally that defendant therein knew of the Davis-Besse accident and nevertheless completed construction of the TMI plant with the faulty pilot-operated relief valve. Moreover, plaintiffs complain in the other suit that B & W promulgated safety regulations designed to avoid a similar accident and that they failed to notify plaintiffs of the new proce-

dures. The complaint against B & W sounds in *misrepresentation* and not negligence. Here, of course, plaintiffs assert that similar allegations purportedly sound in negligence and not misrepresentation.

Recently, the New York Court granted B & W's motion for summary judgment on all of plaintiffs' claims grounded in strict liability. *See, General Public Utilities Corp. v. Babcock & Wilcox Co.,* 547 F.Supp. 842 (S.D.N.Y.1982).

spect and approve license applications, operating procedures and design specifications, etc., is much like the beacon which the Coast Guard provided to warn mariners in *Indian Towing*. Since the duty was purportedly breached, plaintiffs urge that the Government's motion to dismiss must be denied.

The Government, on the other hand, views the case as falling squarely within the line of cases which follow *Neustadt*. Its assertion is that a look beyond the literal wording of the complaint discloses, at best, a simple negligent misrepresentation to plaintiffs of their plant's safety. Moreover, the NRC's purported failure to warn can amount to a negligent misrepresentation by omission since the exception applies to cases where "mere 'talk' or failure to 'talk' on the part of a government employee is asserted as the proximate cause of the damages". *City & County of San Francisco v. United States*, 615 F.2d 498, 505 (9th Cir.1980), *quoting*, *National Mfg. Co. v. United States*, 210 F.2d 263, 276 (8th Cir.1954).

The case at bar actually represents a hybrid case falling somewhere between *Neustadt* and *Indian Towing*. The *Indian Towing* line of cases usually involves the negligent "operational control" [6] of the harm-causing instrumentality. Damages generally are expressed in terms of personal injury or loss of property. The cases which follow *Neustadt* concern governmental transmission of false or inadequate information which results in damages flowing from commercial decisions based thereon. Under *Neustadt*, there is no "operational control" and frequently no liability. *Green*

*v. United States*, 629 F.2d at 581. In the case at bar, we have the *Neustadt* element of the transmittal of false information coupled with the *Indian Towing* element of property damage.

■ We recognize that the characterization of plaintiffs' complaint as sounding in actionable negligence or in inactionable negligent misrepresentation is not free from doubt and that the decided cases are not fully reconcilable, *Green v. United States*, 629 F.2d at 585. Nevertheless, we conclude that the NRC's lack of "operational control" of TMI [7], coupled with plaintiffs' allegations of "misrepresentation" in the B & W suit [8] and the NRC's "failure to talk" here, warrants our conclusion that the suit sounds in negligent misrepresentation as defined in *Neustadt* and its progeny. This does not, however, end our inquiry.

Most of the cases which discuss the *scope* of the misrepresentation exception opine that it is limited "very largely", *Neustadt*, 366 U.S. at 711 and n. 26, 81 S.Ct. at 1302 n. 26, to the invasion of financial interests or that it is "most often" applicable to suits alleging improper governmental evaluation of economic factors. *Ramirez v. United States*, 567 F.2d 854, 856 (9th Cir.1977). Plaintiffs, therefore, argue that notwithstanding any characterization of their complaint as sounding in "negligent misrepresentation", this action is not necessarily barred because the complained of misrepresentation does not relate to the invasion of financial interests. Hence, according to plaintiffs, assuming a negligent misrepresentation, they may nevertheless maintain

---

**6.** Plaintiffs asseverated at oral argument that "operational control" is not a *sine qua non* for imposing governmental liability. Rather, they argue that liability may be imposed if the Government fails to warn of a dangerous condition after engendering reliance. This theory is supported by *S.A. Empresa De Vincas Aerea Rio Grandense (Varig Airlines) v. United States*, 692 F.2d 1205 (9th Cir.1982) and *Barnson v. United States*, 531 F.Supp. 614 (D.Utah 1982) (denying motion to dismiss a complaint grounded in the Government's inspection of a privately owned, federally licensed mine.) *See also, Blessing v. United States*, 447 F.Supp. 1160 (E.D.Pa.1978). How-

ever, in most cases in which governmental liability is found, *some degree* of operational control frequently exists.

**7.** Plaintiffs correctly argue that *Toole v. United States*, 588 F.2d 403 (3d Cir.1978), imposed liability absent operational control of the harm-causing instrumentality. However, *Toole* did not address the misrepresentation exception and did not consider whether the lack of operational control would affect the Court's characterization of the suit as sounding in negligence or misrepresentation.

**8.** *See,* note 5, *supra.*

this suit which seeks recompense for the Government's failure to provide *safety data,* rather than the faulty transmission of information containing an economic forecast.

Countering, the Government urges that the multitude of cases which discuss the misrepresentation bar as being "very largely" confined to cases involving financial interests, does not preclude the possibility that suits based upon misrepresentations of non-financial interests and factors are also barred. Indeed, one court noted that it was "unaware" of any Congressional indication to limit the misrepresentation exception to cases alleging financial or commercial loss and concluded that recovery for personal injury, wrongful death or property damage is also barred. *Lloyd v. Cessna Aircraft Co.,* 429 F.Supp. 181, 187 (E.D.Tenn.1977). Other courts disagree. *See, e.g., Kohn v. United States,* 680 F.2d 922, 926 (2nd Cir. 1982) (the misrepresentation exception bars only those suits seeking damages for commercial decisions predicated upon incorrect or incomplete information.) In any case, most courts continue to hold that the misrepresentation bar goes "most often" to cases involving business transactions. Although there may be and probably are grounds for differences of opinion, we conclude that the scope of the misrepresentation exception is not so broad as to bar this suit.

Our conclusion is not altered by the NRC's attempt to characterize their function as supplying business information to plaintiffs. True, plaintiffs are claiming economic damage due to their reliance upon the NRC's misrepresentations. However, the type of information relied [9] upon by plaintiffs differs substantially from that which is traditionally discussed in the cases in which suit is barred. *See e.g., Neustadt.* Moreover, the fact that plaintiffs' damages are expressed as business losses does not transform safety misrepresentations into commercial ones. The articulated "test" for determining the type of misrepresentations which occurred is "not whether the injury was economic, but whether it resulted from a commercial decision based upon governmental misrepresentations". *Preston v. United States,* 596 F.2d 232, 239 (7th Cir.1979). Hence, our inquiry focuses upon whether plaintiffs' injuries *arise* from an economic or a safety misrepresentation. The fact that the injury *manifested* itself as economic harm is irrelevant to this determination. As the Third Circuit noted, Congress, in enacting the FTCA, "focused its attention upon the *type of governmental activity* that might cause harm, not the *type of harm caused".* *Quinones v. United States,* 492 F.2d 1269, 1280 (3d Cir.1974) (emphasis added). Applying these standards we conclude that plaintiffs have suf-

**9.** *Patentas v. United States,* 687 F.2d at 717, stressed the fact that *reliance* upon the Government's undertaking which induces forebearance from engaging in a similar, private undertaking, is one method of properly alleging a claim under the Good Samaritan rule.

*Patentas,* authored by Judge Becker, considered whether plaintiffs could maintain suit against the Coast Guard for the faulty inspection of a ship which exploded during the unloading of its oil cargo. The ship, ELIAS, suffered a fire while at sea. Prior to its unloading, a Coast Guard inspector checked to determine whether it was safe to unload the cargo and to be sure that the cause of the fire had been remedied. The Coast Guard determined that the ship was safe when, in fact, it was not. Thereafter, while unloading, the ship exploded killing thirteen people.

*Patentas* held that the district court properly dismissed the complaint. In discussing the scope of the Government's Good Samaritan

liability, the court noted that none of the plaintiffs had known of the purpose of the Coast Guard inspection. The announced role is that *reliance* upon the Government's inspection must be alleged in order to state a claim under the FTCA for failure to conduct a proper inspection.

In the case at bar, plaintiffs have argued that due to the NRC's undertaking, they and the industry forebore from "developing their own private warning system to monitor nuclear operating experience industrywide". *See,* Plaintiffs' Memorandum In Opposition To Defendants' Motion To Dismiss (Document 18) at 66–67, n. 12. Moreover, in a recently filed amended complaint, plaintiffs have specifically alleged the element of reliance as part of their complaint. *See,* Paragraphs 66A, 66B, 66C of plaintiffs' amended complaint.

Accordingly, the *Patentas* rule aids plaintiffs to the extent that this action is not otherwise barred by the misrepresentation exception.

fered losses due to safety and not commercial misrepresentations and deny defendant's motion predicated upon the misrepresentation exception.

### Discretionary Function Exception

■ We now consider the Government's claim that the "discretionary function exception" bars this suit.[10] Briefly, this exception precludes an FTCA suit against the Government for the harm resulting from the improper exercise of official discretion and is grounded in notions of separation of powers. The Government argues that its decision to issue a license to plaintiffs, to promulgate IE Bulletins, Circulars and to notify Congress of "abnormal occurrences", etc., all involve the exercise of executive discretion which is not subject to judicial scrutiny. For example, defendant argues that prior to the issuance of an "IE Bulletin", NRC officials must exercise their experience, expertise and discretion in determining whether the event is "important", has "potential" for being "generic in nature" and whether "timely information is necessary for licensees". *See Manual,* Chapter 1100–1125–041. Similar determinations must be made prior to the issuance of Circulars which consider whether an event "warrants wide dissemination". *Id.* at 1125–042.

In *Griffin v. United States,* 500 F.2d 1059, 1063–66 (3d Cir.1974), the Third Circuit rejected a contention similar to the one which the Government makes today. Here, the Government contends that it employed discretionary decision-making authority in determining how, if at all, to notify nuclear licensees of the Davis-Besse accident and of other so-called "precursors". Defendant asserts that the scientific judgments which it made in determining the "generic" applicability of the Davis-Besse accident are the kinds of decisions of which the discretionary function exception bars review.

Plaintiff in *Griffin* had injested a live polio vaccine; the Government had previously tested the lot from which it came and certified it as safe. The decision to certify the vaccine required reference by Government scientists to five criteria. Hence, whether the vaccine was safe required exercise of scientific judgment, expertise and discretion by Government scientists.

The court held that the "discretionary function" exception did not bar suit since the judgment involved was of a *scientific* nature and that the discretionary function exception only bars suit predicated upon policy-making decisions; i.e., those which consider the feasibility or practicability of Government programs. *Cf., Dalehite, supra,* (barring suit challenging the Government's decision to create a fertilizer export program using volatile chemicals which resulted in an unprecedented explosion.) The *Griffin* court viewed scientific "judgments", similar to the ones at bar, as essentially ministerial acts performed by Government physicians whose responsibility was "limited" to "merely executing policy judgments" of the Surgeon General. 500 F.2d at 1059. Judge Becker also concluded that regulatory decisions of a scientific or professional character, as opposed to policy-oriented conclusions, are properly reviewable. *Blessing v. United States,* 447 F.Supp. at 1178.

Defendant attempts to distinguish *Griffin* by asserting that the degree of scientific judgment there involved was subject to exact, specific statutory commands, *see e.g., Griffin v. United States,* 500 F.2d at 1062–63, n. 7, whereas here the NRC's scientific judgments as to whether an "abnormal event" occurred at Davis-Besse or whether "generic problems" existed, requires reference to broad, inexact statutory commands. Continuing, defendant urges that the lack of specific statutory guidelines within which NRC scientists exercise their "discretion" distinguishes this case from *Griffin.*

---

10. In view of our conclusion we need not address plaintiffs' alternate argument that *if* the discretionary function exception is applicable, we should not dismiss the suit *at this juncture.* This argument is grounded on the allegation that the record does not now reveal whether NRC scientists actually made a discretionary decision not to warn of Davis-Besse or whether, through default or caprice, they simply abdicated their responsibility.

We disagree. Although NRC scientists possess judgmental latitude broader than that which existed in *Griffin,* we conclude that the governing standards are not so vague or inexact as to call for unfettered scientific "discretion". Indeed, equally broad exercises of judgment have survived similar challenges.

For example, *Caban v. United States,* 671 F.2d 1230, 1233 (2nd Cir.1982) held that an immigration officer's judgment governed by standards requiring reference as to how an applicant "appears" and requiring that the official be properly "satisfied" of the proofs of entitlement, are not so broad as to compel immunization from suit under the discretionary function exception. *Ingham v. Eastern Airlines,* 373 F.2d 227, 233 (2nd Cir.), *cert denied,* 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967) held that the duty to report changing weather conditions when "necessary" was sufficient guidance to withstand challenge. *Accord, Wenninger v. United States,* 234 F.Supp. 499, 504 (D.Del. 1964), *aff'd,* 352 F.2d 523 (3d Cir.1965). Moreover, there is nothing so unique in the type of injury at bar as to preclude application of traditional tort principles. *Allen v. United States,* 527 F.Supp. 476, 488 (D.Utah 1981).

Finally, the *Griffin* court noted that the judgments which Government scientists may permissibly make are circumscribed by applicable regulations; where decision-makers exceed that scope, liability may properly be imposed. 500 F.2d at 1068–69. *See also, United Scottish Ins. Co. v. United States,* 614 F.2d 188, 198 (9th Cir.1979) (the breach of "duty creating" regulations vitiates the Government's ability to assert the discretionary function exception).

### Conclusion

The issues which we have addressed, the initial characterization of the suit as sounding in misrepresentation or negligence, the contours of the misrepresentation exception and the proper breadth of the Government's discretion are all "controlling issues" which admit to a "substantial ground for difference of opinion". 28 U.S.C. § 1292(b). Indeed, in deciding these issues we have considered numerous decisions which are admittedly not "fully reconcilable". *Green v. United States,* 629 F.2d at 585. Moreover, our conclusion to deny the Government's motion to dismiss subjects the Government to tremendous trial costs, a staggering amount of potential liability [11] and forces them to defend a suit in which they may ultimately prevail on jurisdictional issues. As such, we conclude that the "ultimate termination" of this litigation may well be "materially advanced" by an immediate appeal. *See, Katz v. Carte Blanche Corp.,* 496 F.2d 747, 755 (3d Cir.1974), 28 U.S.C. § 1292(b).

Accordingly, we will certify this matter for an immediate interlocutory appeal and stay all proceedings in this Court pending the outcome thereof. *Id.* The question which we certify to the Third Circuit is no broader than that which has previously been certified for such an appeal, *Zenith Radio Corp. v. Matsushita Electric Industrial Co., Inc.,* 478 F.Supp. 889, 946 (E.D.Pa. 1979), and is as follows:

"Is our decision correct that neither the misrepresentation nor the discretionary function exception bars this suit?"

An appropriate order will issue.

---

11. We recognize that the amount in controversy, coupled with the industry involved and the identity of the defendant invites a visceral reaction quite unlike that which normally permeates litigation. However, we have at all times sought to dispense true Plutonic justice; i.e., justice deriving from "reason unaffected by passion".