Robert L. PRESTON, et al.,
Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 84–1408.

United States Court of Appeals,
Seventh Circuit.

Argued April 24, 1985.

Decided Nov. 8, 1985.

James E. Betke, McDermott, Will, Emery Chicago, Ill., for plaintiffs-appellants.

Sheree L. Gowey, Asst. U.S. Atty., Madison, Wis., for defendant-appellee.

Before COFFEY and FLAUM, Circuit Judges, and GIBSON, Senior Circuit Judge.[*]

FLAUM, Circuit Judge.

This case involves a claim by numerous farmers against the United States for common law conversion pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2674 (1982). The main issue presented on appeal is whether the district court abused its discretion in calculating the damages due the farmers. We find no abuse of discretion, and accordingly affirm the district court's judgment.

## I.

The plaintiffs Robert L. Preston and others are farmers (and the estates of deceased farmers) who deposited grain subject to either warehouse receipts or "price later contracts" in a grain warehouse operated by Grain Finance Company ("Grain Finance") and by Farmers Grain Exchange, Inc. ("FGX") in Evansville, Wisconsin. In addition to storing grain subject to warehouse receipts and price later contracts, the warehouse was an authorized depository for grain owned by or pledged to the Com-

---

[*] The Honorable Floyd R. Gibson, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

modity Credit Corporation ("CCC") of the United States Department of Agriculture.[1]

On November 13, 1972, following a periodic audit, the CCC discovered that there was a substantial shortage of grain at Grain Finance. The CCC issued two loading orders for the grain on November 21 and 22, 1972, directing that all of the grain in storage at the warehouse be delivered to the CCC. The CCC received a total of 293,466.12 bushels of grain pursuant to these loading orders. This amount exceeded the pro rata share to which the CCC was entitled in November 1972. Following this delivery, the storage facilities filed for bankruptcy.

In 1977, the plaintiffs filed an action against the United States for misrepresentation and conversion under the Federal Tort Claims Act. The district court dismissed the plaintiffs' complaint on the ground that the claims of misrepresentation or deceit were barred by the exception for such claims in the Federal Tort Claims Act, 28 U.S.C. § 2680(h) (1982). The district court did not discuss the CCC's alleged conversion in its opinion. This court affirmed the district court's decision as to misrepresentation, but reversed and remanded for the lower court to address the conversion claim. *Preston v. United States*, 596 F.2d 232 (7th Cir.), *cert. denied*, 444 U.S. 915, 100 S.Ct. 228, 62 L.Ed.2d 169 (1979) (*"Preston I"*). We concluded that if the district court found that the CCC had converted grain belonging to the farmers, then the farmers would be entitled to damages under the Federal Tort Claims Act. *Id.* at 240.

The plaintiffs filed an amended complaint in the district court, and at the conclusion of the plaintiffs' evidence, the court directed a verdict for the United States. The district court held that the plaintiffs' action was barred by the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a) (1982), and that the plaintiffs had not stated a claim for conversion. On appeal to this court, we held that the plaintiffs had stated a claim for conversion that was not barred by the discretionary function exception. *Preston v. United States*, 696 F.2d 528 (7th Cir.1982) (*"Preston II"*) *rehearing en banc denied*, 709 F.2d 488 (7th Cir.1983). We remanded the case to the district court to permit the United States to present evidence on the issue of liability since the district court had directed the verdict at the conclusion of the plaintiffs' case. In an opinion accompanying the denial of the petition for rehearing in that case, we outlined some guidelines for the district court to use in computing the plaintiffs' damages should the United States be held liable for conversion. *Preston v. United States*, 709 F.2d 488 (7th Cir.1983).

On remand, the United States agreed not to contest liability. On the issue of damages, the plaintiffs presented evidence that the United States had converted 186,479.14 bushels of grain in excess of its pro rata share according to this court's guidelines based on figures as of the close of business on November 20, 1972. The plaintiffs sought as damages the value of the converted grain and an amount to cover the plaintiffs for their loss of the use of the converted grain. Using figures as of the close of business on November 30, 1972,

---

**1.** The two companies stored grain for Evansville area farmers in the warehouse and issued warehouse receipts for the grain in the names of Grain Finance and FGX. *Preston v. United States*, 596 F.2d 232, 234 (7th Cir.), *cert. denied*, 444 U.S. 915, 100 S.Ct. 228, 62 L.Ed.2d 169 (1979). The warehouse served as a depository for CCC-owned grain and also as a depository for grain stored in the warehouse by the CCC as a result of its low-interest, non-recourse loans to farmers. *Id.* at 234 n. 2. If the farmer repaid the loan and interest, he would be able to reclaim his grain. If he did not repay the debt,

the CCC would take title to the grain (the collateral for the loan), and the farmer's obligation would be completely discharged. *Id.* at 234 n. 2.

The farmers also deposited grain at the warehouse under such other arrangements as simple bailments and price later contracts, which did not involve loans by the CCC to the farmers. *Id.* at 235. Under a price later contract, Grain Finance and FGX would purchase some of the grain deposited by the farmers subject to agreements to pay the market price for the grain at a future date. *Id.* at 235 n. 3.

the United States conceded that it had received 131,153 bushels of grain in excess of its pro rata share, but claimed that this amount would result in a windfall to the plaintiffs. The United States thus argued that the plaintiffs should only receive the amount of damages representing their proportionate share of the grain that was held by all depositors, or 69,797.15 bushels. In an opinion issued on February 10, 1984, the district court established its own damages formula and concluded that the United States had converted only 22,380.72 bushels in excess of its pro rata share. The court valued each bushel at $3.56 and entered judgment against the United States in the amount of $79,675.36.

On appeal, the plaintiffs claim that the district court abused its discretion in calculating damages by failing to follow this court's guidelines as to how damages should be computed. The plaintiffs also claim that they are entitled to recover as additional compensatory damages the value of the loss of use of the converted grain for the years that the United States has had the use of that grain.

## II.

In *Preston II*, this court held that the plaintiffs had demonstrated that the CCC had wrongfully taken property owned by the plaintiffs and that an action in conversion was appropriate. 696 F.2d at 540. We concluded that a proper guideline for measuring damages would be to hold the CCC liable for the value of all grain taken in excess of its pro rata share as of November 21, 1972, the day that the first loading order was issued by the CCC. *Id.* at 543. Since there was a severe shortage at the grain warehouse and since it was undisputed that the CCC had obtained virtually 100% of the grain represented by its warehouse receipts, we concluded that it was clear that the CCC had taken more than its pro rata share. *Id.* at 536.

In denying the petition for rehearing in *Preston II*, we noted that we could not compute with precision the actual monetary damages that the plaintiffs should receive

under the above guidelines and that the district court would thus have discretion to deviate from these guidelines if their application would result in an inequity. *Preston v. United States*, 709 F.2d at 491. We concluded that the district court was to be given great latitude in resolving the numerous issues involved in computing a proper amount of damages, since appellate review is extremely limited in such cases, and that the district court's findings were to be affirmed unless they were "beyond the pale of sane judgment." *Id.* (quoting *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477, 484 (7th Cir.1980)). Thus, in reviewing the district court's present award of damages, we will only reverse that award if it is clearly erroneous or if we are left with the definite and firm conviction, after reviewing all of the evidence, that a mistake has been committed. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *Ferrero v. United States*, 603 F.2d 510, 512 (5th Cir.1979).

In the present case, the district court devised a formula for measuring the amount of grain that the CCC converted in excess of its pro rata share as of November 30, 1972. The district court took the number of bushels of grain that the CCC had deposited at the warehouse (293,466.12) and divided that figure by the total number of bushels of grain that should have been stored at the warehouse by the plaintiff farmers, the nonplaintiff farmers, and the CCC (69,797.50 + 111,337.86 + 293,466.12 = 474,601.48). The result represents the CCC's percentage share of the total number of bushels of grain at the warehouse. The district court then multiplied this percentage figure by the number of bushels of grain that were actually in storage in November 1972 when the warehouse was experiencing financial difficulties (438,406.-84), in order to determine the CCC's pro rata share of the grain that was present in the warehouse before the CCC issued its loading orders. If the variable "y" represents the CCC's pro rata share, then the formula would be as follows:

$$y = \frac{\text{number of CCC's bushels}}{\text{total warehouse grain obligations (number of CCC's bushels + number of plaintiff farmers' bushels + number of nonplaintiff farmers' bushels)}} \times \text{total number of bushels in storage in November 1972}$$

$$= \frac{293,466.12}{474,601.48} \times 438,406.84$$

$$= 271,085.40$$

Using this formula, the plaintiffs and the nonplaintiff farmers, owning 69,797.50 and 111,337.86 bushels of grain, respectively, would be entitled to the following pro rata share of the total number of bushels in storage as of November 1972:

$$\text{Plaintiffs' Pro Rata Share} = \frac{\text{number of plaintiffs' bushels}}{\text{total warehouse grain obligations}} \times \text{total number of bushels in storage in November 1972}$$

$$= \frac{69,797.50}{474,601.48} \times 438,406.84$$

$$= 64,474.477$$

$$\text{Non-Plaintiff Farmers' Pro Rata Share} = \frac{\text{number of nonplaintiff farmers' bushels}}{\text{total warehouse grain obligations}} \times \text{total number of bushels in storage in November 1972}$$

$$= \frac{111,337.86}{474,601.48} \times 438,406.84$$

$$= 102,846.86$$

The plaintiffs argue that the district court abused its discretion by failing to include the price later obligations in the total warehouse grain obligations when computing the CCC's pro rata share of the grain. In *Preston II*, we indicated that for purposes of determining the CCC's pro rata share, the price later obligations had to be included in the total warehouse grain obligations to compute the extent of the shortage because the warehouse had obtained title to the grain from the farmers at the time that it entered into the price later contracts, and thus had become a co-tenant in the common mass of warehouse grain along with the CCC, the plaintiff farmers, and the nonplaintiff farmers, to the extent of the warehouse's interest. 696 F.2d at 543. On remand, the district court did not include the price later obligations in the total warehouse grain obligations for the reasons outlined below. Although we agree with the conclusion in *Preston II*

that the warehouse became a co-tenant in the common mass of commingled grain, upon further reflection and briefing by the parties, we must agree with the district court that the amount of the price later contracts should not be included in calculating the CCC's pro rata share.

As explained earlier, price later obligations arose when the warehouse purchased grain deposited by a farmer and agreed to pay the market price for this grain at a future date. We held in *Preston II* that the plaintiffs were collaterally estopped from litigating the issue of whether title to grain that was subject to a price later contract passed to the warehouse or remained with the farmer since a bankruptcy judge in the proceedings involving Grain Finance and FGX had already concluded that title to the grain passed to the warehouse at the time that the price later contract was executed. 696 F.2d at 543 (referring to *In the Matter of Farmers Grain Exchange, Inc. and Grain Finance Co.*, 1 Bankr.Ct.Dec. (CRR) 1621, 1623 (Bankr.W. D.Wis.1975)). Thus, we concluded that the plaintiffs had no standing to assert conversion as to the grain subject to price later contracts since the warehouse possessed title to such grain. *Id.*

Although the warehouse obtained title to the grain through the price later contracts, it does not necessarily follow that these contracts should be included in the total warehouse grain obligations (represented in the denominator of the fraction in the formula). The grain owned by the warehouse pursuant to the price later contracts should only be included in the total warehouse grain obligations if the warehouse was entitled to a pro rata share. We hold that the warehouse did become a co-tenant in the common mass of grain to the extent of its interest represented by the price later contracts, but that the district court did not abuse its discretion in holding that these contracts should not be included in the formula to determine the CCC's pro rata share since the warehouse was not entitled to share in the total remaining

amount of bushels in storage in November 1972. Although there are no cases decided under Wisconsin law, other courts clearly have held that a warehouse, which commingles its fungible goods with those of other depositors, is only entitled to share pro rata in the goods remaining following a loss for which the warehouse is not responsible. *See Preston II*, 696 F.2d at 543; *United States v. City of Jacksonville*, 167 F.2d 366, 368 (5th Cir.1948); *Drudge v. Leiter*, 18 Ind.App. 694, 702–03, 49 N.E. 34, 37 (1898). If the warehouse is responsible through its fault or negligence for the loss, then it, as a bailee for the goods, will not be entitled to share pro rata in the goods remaining following the loss. *United States v. Jacksonville*, 167 F.2d at 368–69; *Drudge v. Leiter*, 18 Ind.App. at 702–03, 49 N.E. at 37.

In the present case, the disparity between the grain on hand and the grain needed to meet the warehouse's obligations was due to Grain Finance and FGX's practice of distorting the audits of their books by using the same grain both to represent purchases and obligations of the legally separate, but physically integrated firms. *Preston I*, 596 F.2d at 235. The warehouse, as bailee of the grain in storage, was therefore not entitled to share pro rata in the grain remaining in the warehouse in November 1972 following its financial difficulties. The number of bushels represented by price later contracts should therefore not be included in the total warehouse grain obligations when dividing the number of bushels remaining in November 1972 among the plaintiffs, the nonplaintiff farmers, and the CCC. The district court noted that it had found nothing in the record indicating that the warehouse claimed an ownership interest in any of the grain remaining in its inventory in November 1972. Furthermore, the district court found that the price later contracts were never considered grain obligations as revealed by the fact that these contracts were not routinely taken into account in the Agricultural Marketing Service reports of shortage or overage. Thus, we hold that the district court did not abuse its discretion in concluding

that it would be inaccurate and unfair to treat the warehouse's price later obligations as grain obligations for the purpose of determining the CCC's pro rata share of the grain at the warehouse at the time of the CCC's conversion.

█ In addition to arguing that the price later contracts should have been included in computing the CCC's pro rata share, the plaintiffs argue that the district court should have selected November 20, 1972, rather than November 30, 1972, as the date on which the CCC's pro rata share should have been computed. On November 30, the CCC issued its second loading order covering 91,517 of the total 293,466.12 bushels of grain pledged to the CCC to secure loans to farmers. As a result of this order, the CCC claimed entitlement to this additional amount of grain as of November 30, while the CCC would not have been entitled to such grain on November 21 when the first loading order was issued.

In *Preston II*, we held that the CCC's pro rata share should be determined as of November 21, 1972, when the CCC issued its first loading order. 696 F.2d at 543. In selecting November 30, 1972, as the date on which the CCC's pro rata share was to be determined, the district court held that there was no reliable data available for November 21, 1972. The plaintiffs had suggested that the district court use figures for November 20, 1972, the day before the first loading order was issued. The CCC argued in its brief that the figures for November 20 were based solely on calculations made by the secretary for the plaintiffs' attorney and were not demonstrably reliable. In view of both the fact that the shipments for the loading orders continued through October 1974 and the conflict between the parties as to the reliability of the figures for November 20, 1972, we conclude that the district court did not abuse its discretion in selecting November 30, 1972, as the date on which the CCC's pro rata share was to be computed.

█ Using the formulas outlined above, we hold that the district court correctly

determined that the CCC was entitled to 271,085.40 bushels of grain from the total number of bushels in storage in November 1972. Since the CCC's pro rata share was 271,085.40 bushels, and since it actually received 293,466.12 bushels pursuant to its loading orders, the CCC converted 22,380.72 bushels of grain and must disgorge the value of that amount, or $79,675.36 (at the $3.56 price per bushel used by the district court). Pursuant to this court's decision accompanying the denial of the petition for rehearing in *Preston II*, the district court ordered the CCC to disgorge the value of all of the grain that the CCC had converted, or $79,675.36, to the plaintiff farmers rather than limiting the plaintiffs' recovery to the fraction representing their proportionate representation of all of the depositors at the warehouse. *See Preston v. United States*, 709 F.2d at 490.[2] As we explained in *Preston II*, the plaintiffs were entitled to recover the full amount in order to balance certain concessions granted to the CCC and to insure that the CCC not benefit from its wrongdoing. *Id.* at 490–91. Furthermore, we had noted that our decision to not reduce the plaintiffs' recovery by the nonplaintiff farmers' interest would not act to foreclose the claims of these potential plaintiffs because those claims were already time-barred under 28 U.S.C. § 2401(b) (1982). *Id.* at 491 n. 2. In sum, we affirm the district court's decision to award the plaintiffs $79,675.36 in damages for the CCC's wrongful conversion of their grain.

■ The plaintiffs' final argument is that they are entitled to recover as additional compensatory damages the value of the loss of use of the converted grain during the twelve years that the CCC has had the use of that grain. While acknowledging that the Federal Tort Claims Act, 28 U.S.C. § 2674 (1982), bars an award of prejudgment interest, the plaintiffs seek to distinguish an award of interest from compensation for the loss of use of the convert-

ed items. The district court rejected this argument because it found that the plaintiffs were really seeking an award of interest.

We affirm the district court's decision denying compensation to the plaintiffs for the loss of the use of their grain for twelve years. In reality, the plaintiffs are seeking an award of prejudgment interest since they would have sold the grain if the CCC had not converted it and since they would have been able to obtain interest on the proceeds from this sale. Compensation for the use of money damages prior to judgment would clearly be an award of prejudgment interest, which is barred by the Federal Tort Claims Act. *See Southern Pacific Transportation Co. v. United States*, 471 F.Supp. 1186, 1197 (E.D.Cal.1979). Although the courts have allowed recovery for loss of use damages for items that can be used for the production of income in the future, the courts have not allowed recovery of an award that represents either an advantage to the United States from its possession of money damages from the time of the injury to the date of the judgment or a disadvantage or loss to the plaintiff occasioned by the fact that payment of the damage award occurred some months or years after the injury was suffered. *Id.* at 1195–97. In sum, we hold that the plaintiffs in the present case are really seeking to recover for the loss of the use of money from the sale of the grain or prejudgment interest, which is barred by the Federal Tort Claims Act.

In conclusion, we affirm the district court's decision awarding the plaintiffs $79,675.36 in damages for the 22,380.72 bushels of grain converted by the CCC from November 1972 to October 1974.

---

**2.** The plaintiffs really had only 69,797.50 bushels of grain in storage at the warehouse, while the other nonplaintiff farmers had 111,337.86 bushels of grain at the warehouse. Thus, one could argue that the plaintiffs were really only entitled to 69,797.50/181,135.36 or 38.53% of the 22,380.72 bushels of grain converted by the CCC.