732 P.2d 661

OPPENHEIMER INDUSTRIES, INC., a
Delaware Corporation,
Plaintiff-Appellant,

v.

JOHNSON CATTLE CO., INC., an Idaho
Corporation; Dan Van Lith, an individual; Orie Leavell, D/B/A LCC Cattle
Co., an individual; Owen Ranches, Inc.,
a California Corporation; Lee Wright,
an individual; Bob Johnson, an individual; Agra Beef, an unknown business entity; Coakly Cattle Co., an unknown business entity; Boston Beef, an
unknown business entity; Lokens Cattle Co., an unknown business entity,
Defendants,

and

The State Brand Board of the State of
Idaho; and the State of Idaho,
Defendants-Respondents.

No. 16214.

Supreme Court of Idaho.

Nov. 19, 1986.

On Denial of Rehearing Feb. 27, 1987.

Stephen L. Beer, Boise (argued), and Frank P. Sebree, II, Kansas City, Mo., (appeared), for plaintiff-appellant.

Brian K. Julian, Boise, for defendants-respondents.

HUNTLEY, Justice.

This appeal arises out of a grant of summary judgment for the State Brand Board on the ground that the complaint by Oppenheimer Industries (Oppenheimer) was barred by provisions of the Idaho Tort Claims Act.

In 1981, Oppenheimer contracted with Bolen Cattle Co. (Bolen) to care for several head of cattle owned by Oppenheimer. Oppenheimer alleges Bolen re-branded the cattle and sold them without Oppenheimer's permission. Oppenheimer sued Bolen and several of the purchasers of the Oppenheimer cattle for conversion in February 1983 and brought action against the State Brand Board on the theory that the Board's failure to require proof of ownership of the cattle despite presence of "fresh" brands on the cattle violated the non-discretionary directives of the Idaho Administrative Procedure Act (IDAPA) 11.-02.3 [1] and constituted actionable negligence, as such failure resulted in the conversion of Oppenheimer's cattle.

A state deputy brand inspector inspected the converted cattle prior to the sale and noticed two brands on the cattle, one of which was "fresh," (i.e. had not yet scabbed over or healed). Such "fresh" brands were, at the most, two weeks old and could have been as new as one day old. The inspector testified that he knew he had the right to require proof of ownership of such cattle before they were sold, but that it was general practice to merely rely on the reputation of the seller (here, Bolen). The inspector had heard nothing detrimental concerning Bolen's reputation. The inspector also stated that he simply could not conceive of a "scam" of such magnitude, involving so many cattle (1,681 head). As a result, the inspector neither requested proof of ownership or a bill of sale from Bolen, nor did he advise Oppenheimer that cattle bearing its brand were being sold by Bolen, which fact the inspector knew prior to the sale.

The trial court reached its ruling on two grounds. First, it ruled that the operation of IDAPA 11.02.3 (footnote 1, *supra*) allows discretionary judgment by state deputy brand inspectors and, therefore, that the "discretionary function" exemption to the Idaho Tort Claims Act, I.C. § 6–904(1), applied to immunize the State Brand Board in this instance. Second, the court held that Oppenheimer's loss of its cattle was, essentially, only an economic loss, and, therefore, unrecoverable in a negligence action. We address each issue in turn, and also address respondent's additional argument that the misrepresentation exception to governmental liability under the I.T.C.A., I.C. § 6–904(4), supports dismissal of the complaint.

## THE "DISCRETIONARY FUNCTION" EXEMPTION

The trial court, in examining IDAPA 11.-02.3, found that the regulation permits inspectors at least two exercises of discretion. One, the inspector could determine whether or not a brand was "fresh." Second, the inspector *"may* inquire into the ownership of all livestock bearing two or

---

1. IDAPA 11.02.3 provides:
   IDAPA 1.02.3
   —Fresh brands on cattle, horses, mules and asses bearing older brands shall not be accepted as proof of ownership unless accompanied by a brand inspection certificate or a bill of sale covering older brands.
   (a) The State Brand Inspector may inquire into the ownership of all livestock bearing two or more brands.

more brands." (IDAPA 11.02.3(a)). Operating without the benefit of *Sterling v. Bloom*, 111 Idaho 211, 723 P.2d 755 (1986), the court then held that, pursuant to *Chandler Supply Co., Inc. v. City of Boise*, 104 Idaho 480, 660 P.2d 1323 (1983), "[I]t is clear that the State Brand Board's employee, the inspector, was involved in an operational decision-making process in the performance of the function of the State Brand Board" in not making further inquiry as to the ownership of the cattle.

■ In *Sterling*, 723 P.2d at 770–776, we overruled *Chandler, supra,* to the extent that its analysis of the "discretionary function" exemption [2] did not comport with the federal planning-operational test. *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). (*See also, Jones v. City of St. Maries*, 111 Idaho 733, 727 P.2d 1161 (1986). *Lewis v. City of Blackfoot*, 111 Idaho 755, 727 P.2d 1183 (1986). Pursuant to this test, discretionary or planning functions of government are exempt from liability in tort, whereas operational functions conducted without "ordinary care" give rise to no governmental immunity. I.C. § 6–904(1). In *Lewis, supra,* we further explained this test by noting that decisions made under statutes and regulations which leave room for policy judgment in their execution *are* discretionary. *Lewis, supra,* at 757, 727 P.2d at 1185.

In the instant case, IDAPA 11.02.3 sets forth the standard of conduct required of a state brand inspector in *two distinct contexts:* When confronted with a "fresh" brand, and when confronted with two or more brands. The regulation clearly states that, "fresh brands ... *shall not* be accepted as proof of ownership unless accompanied by a brand inspection certificate or a bill of sale covering older brands." (Emphasis added). That regulation further provides:

"(a) The state brand inspector *may* inquire into the ownership of all livestock bearing two or more brands." (Emphasis added).

■ The language of the regulation speaks for itself. While a state brand inspector *may* exercise discretion in deciding whether to inquire into the ownership of livestock bearing *two or more* brands, the appearance of a *"fresh"* brand *mandates* that the same inspector *shall not* accept such a brand as proof of ownership absent a certificate or bill of sale covering older brands. There is *no* room for discretion in implementing this policy directive. Accordingly, since the deputy brand board inspector in the instant case testified that the brands he encountered were *"fresh,"* but he nevertheless did not require further proof of ownership of the cattle, the trial court erred as a matter of law in dismissing the complaint on the basis of the "discretionary function" exemption of I.C. § 6–904(1).

### "ECONOMIC" DAMAGES

The trial court also ruled that Oppenheimer's claims against the State Brand Board failed to state a cause of action in tort because Oppenheimer's claims were based upon economic damages, i.e., loss of the cattle, which loss alone, it held, may not support a tort action, incorrectly construing *Clark v. International Harvester Co.*, 99 Idaho 326, 581 P.2d 784 (1978).

In *Clark*, the purchaser of a defective product who had sustained no property damage or personal injury was not permitted to recover purely economic losses based

2. I.C. § 6–904(1) reads:

**6–904. Exceptions to governmental liability.**—A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:

1. Arises out of any act or omission of an employee of the governmental entity exercising ordinary care, in reliance upon or the execution or performance of a statutory or regulatory function, whether or not the statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused.

upon a complaint alleging negligence. In the instant case, Oppenheimer is not alleging mere economic damage. Unlike the plaintiff in *Clark*, Oppenheimer is not still in possession of defective goods. Rather, Oppenheimer has suffered the *loss* of its *property* (i.e. the cattle) due to the negligence of the deputy brand inspector.

■■■ It is a long-held legal maxim that animals are tangible property and that intentional acts leading to the destruction or loss of such chattels give rise to a cause of action for conversion (conversion being a tort). *Graham v. Smith*, 100 Ga. 434, 28 S.E. 225 (1897). It is also black-letter law that a cause of action in negligence is available for one whose chattel is lost or destroyed through the negligence of another. "A conversion can result only from conduct intended to affect the chattel. For merely negligent interference with it, such as failure to protect it against loss, damage or theft, the remedy is an action for negligence; . . . ." (Prosser & Keeton on Torts, § 15 p. 92, 5th ed. 1984). (*See also, Armored Car Service, Inc. v. First National Bank of Miami*, 114 So.2d 431 (Fla.App. 1959). Thus, whether the actions of the deputy brand inspector were intentional or negligent, Oppenheimer has a cause of action in tort.

## THE "MISREPRESENTATION" THEORY

The Board also seeks to invoke the "misrepresentation" exception to governmental liability under the Idaho Tort Claims Act, I.C. § 6–904(4).[3] The Board alleges that the gist of Oppenheimer's complaint is that the State Brand Board's certification of the Oppenheimer cattle for sale under the Bolen brand was a "misrepresentation" invoking § 6–904(4). The Board cites several cases as supporting this position. Without exception, each case cited by the Board involves a plaintiff who had suffered damage through *reliance* upon some *communication* made by the government. (*United States v. Neustadt*, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961) (claim of purchaser of real property who allegedly paid purchase price in excess of value of property in reliance upon an inaccurate FHA inspection barred by the misrepresentation exception); *Hall v. United States*, 274 F.2d 69 (10th Cir.1959) (claim of plaintiff alleging negligent inspection and report of plaintiff's cattle as diseased by Department of Agriculture inspectors, leading to sale of the cattle at a loss, barred by the misrepresentation exception); *Saxton v. United States*, 456 F.2d 1105 (8th Cir.1972) (claim alleging governmental officials had given plaintiffs notice that their cattle were not diseased, when in fact they were, preventing treatment of the cattle, barred by the misrepresentation exception); *Preston v. United States*, 596 F.2d 232 (7th Cir. 1979) (cert. den. 444 U.S. 915, 100 S.Ct. 228, 62 L.Ed.2d 169 (1979), later app. 776 F.2d 754) (claim of reliance on government approval of a grain storage warehouse barred by the misrepresentation exception)).

Here, the State Brand Board made no misrepresentation to Oppenheimer. Indeed, no communication was *ever* made to Oppenheimer by the brand board. The Board's reliance on the above cited authority is, therefore, entirely misplaced. The Board further attempts to harmonize *Block v. Neal*, 460 U.S. 289, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983), with the instant case. In *Block*, the plaintiff obtained a loan from the Farmer's Home Administration (FmHA), and then contracted with a builder to build according to the FmHA specifications. The FmHA had the right to inspect, test and reject defective materials and workmanship. After an FmHA inspection failed to reveal defects, plaintiff experi-

---

3. I.C. § 6–904(4) states:

**6–904. Exceptions to governmental liability.**—A governmental entity and its employees while acting within the course and scope of the employment and without malice or criminal intent shall not be liable for any claim which:

. . . .

(4) Arises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

enced a failure of the home's heating system and sued the FmHA for negligence in failing to properly inspect and supervise the construction of the house. *Block* held that the owner's complaint was not based upon misrepresentation theory, but on negligent supervision and inspection and was not, therefore, barred by the misrepresentation exception of the Federal Tort Claims Act. *Block* explained the nature of an action for misrepresentation:

> "We cannot agree with petitioners that this case is controlled by *Neustadt*. As we recognized in that decision, the essence of an action for misrepresentation, whether negligent or intentional, is the communication of misinformation on which the recipient relies...." (*Block*, 460 U.S. at 296, 103 S.Ct. at 1093.)

The Board argues that the *Block* holding was based solely on a complaint for negligent supervision and not on any reliance upon information given to the plaintiff in that case. The Board then analogizes to the instant case, stating that the brand inspector had no duty of supervision over Bolen and its operations. This argument ignores the obvious—namely, that Oppenheimer's complaint is based on an allegation of the negligent performance of an inspection *required* by IDAPA 11.02.3. As the *Block* court explained:

> "Section 2680(H) [analogous to I.C. § 6–904(4)] thus relieves the government of tort liability for pecuniary injuries which are wholly attributable to reliance on the government's negligent mistatements. As a result, the statutory exception undoubtedly preserves sovereign immunity with respect to a broad range of government actions. But it does not bar negligence actions which focus not on the government's failure to use due care in communicating information, but rather on the government's breach of a different duty." (*Block*, 460 U.S. at 297, 103 S.Ct. at 1093.)

█ The misrepresentation exception to the Idaho Tort Claims Act simply does not apply in this case.

For each of the reasons herein discussed, we must reverse and remand for further proceedings consistent herewith.

Costs to appellant. No attorney fees awarded.

DONALDSON, C.J., and BISTLINE, J., concur.

BAKES, Justice, dissenting:

I

The majority inaccurately states the facts when it asserts that the deputy brand inspector "knew prior to the sale" that the cattle involved bore Oppenheimer's brand. In the first instance, more than one sale of cattle occurred. The alleged transactions involved at least ten different buyers on eleven different dates over seven months' time. Second, there is nothing in the record to indicate when the actual sale contracts were executed between Bolen and the various buyers. In short, there is nothing in the record to even indicate that the sales were conditioned on the issuance of a brand inspection certificate. The evidence that is in the record does not show that the buyers were the ones to request the brand inspection at issue. Rather, the record clearly shows that all of the inspections were requested by Bolen's agents, not by the purchasers. Indeed, in at least two of the sales transactions, the buyers were so disinterested in the brand inspection that they did not even sign the inspection certificates. Furthermore, the uncontradicted testimony of the deputy brand inspector was to the effect that it was a custom in the industry that if a purchaser of cattle had any questions regarding the presence of a fresh brand his request to the brand inspector for additional proof of ownership would be honored. The brand inspector in the-present case further testified that none of the buyers present at any of the brand inspections ever questioned the propriety of issuing a certificate without additional proof of ownership.

Third, the deputy inspector testified that he did not even become aware of Oppenheimer's brand until some time in July. At

least six transactions (inspections) had occurred before the presence of the Oppenheimer brand was discovered.[1] Even once discovered, there was no requirement (in either statute or regulation) that the inspector notify Oppenheimer of the sale of cattle bearing its brand. The majority's assertion to the contrary is clearly erroneous.[2]

Given the lack of information in the record regarding when the sales of the cattle occurred, *i.e.,* when the sales contracts were executed, the basic premise underlying Oppenheimer's claim and the majority's position, *i.e.,* but for the "negligent inspection" the sales would not have occurred, is without support. On this basis alone, Oppenheimer has failed to produce evidence sufficient to support a cause of action against the state upon which relief may be granted and, therefore, the district court's award of summary judgment in favor of the state should be affirmed.

## II

The majority has also failed to focus on pertinent language contained in the Idaho Tort Claims Act (ITCA). I.C. § 6–901 *et seq.* The ITCA renders the state liable in money damages for the negligent acts of its agents which result in "bodily injury" or "property damage." I.C. § 6–926. "Bodily injury" and "property damage" are specifically defined terms. I.C. § 6–902(5), (6). Oppenheimer's claim appears to be based on some alleged "property damage," since it is clear that there was no "bodily injury" to Oppenheimer Industries, a corporation. Yet, it is also clear that the acts of the deputy brand inspector in no way caused any property damage to Oppenheimer. The inspector's alleged negligent inspection did not result in "injury or destruction" of Oppenheimer's cattle. Any injury to Op-

penheimer's cattle had occurred long before the brand inspection was conducted.

The essence of Oppenheimer's claim for damages is premised upon the tort of conversion. Bolen's tortious acts constituted the conversion. If Bolen hadn't converted the cattle, then Oppenheimer would have no claim for damages. Yet, the conversion had occurred when Bolen placed his brand on the cattle, at least two weeks prior to the brand inspection. Bolen's act of rebranding was the act of conversion. Conversion is any "distinct act of dominion wrongfully exerted over another's personal property in denial or inconsistent with his rights therein...." *Torix v. Allred,* 100 Idaho 905, 910, 606 P.2d 1334, 1339 (1980). *Accord Gissel v. State,* 111 Idaho 725, 727 P.2d 1153 (1986); *Klam v. Koppel,* 63 Idaho 171, 118 P.2d 729 (1941). Thus, Bolen's act of rebranding the cattle constituted "[a] claim of title by one who is in possession, which reasonably implies that the owner will not be permitted to obtain the goods ...." Prosser & Keeton, *Torts* § 15 (1984).

By the majority's own admission, such acts had occurred as early as two weeks prior to the brand inspections at issue. The acts of conversion were not committed by the brand inspector, at his insistence, or even with his knowledge. Neither the State of Idaho nor the brand inspector had possession of the cattle at any time, nor did they assert any dominion over the cattle or make any claim to title or right to possession of the cattle. Thus, neither the State of Idaho nor the brand inspector committed any of the traditional acts of conversion which our prior cases have recognized. *Torix v. Allred, supra.* The Court, by its decision today, has not just removed the state's defense of sovereign immunity, it

---

1. The majority states that the cattle involved had only two brands. The uncontradicted testimony of the deputy brand inspector was that the cattle in all the inspections had at least three brands, only one of which was fresh.

2. The only notification requirement imposed by statute involves secured transactions where a security interest is created in the cattle. In such circumstances, the secured party may request notification from the brand board whenever sales of its cattle occur for which a brand inspector issues an inspection certificate. However, in the present case, the uncontraverted evidence in the record indicates that no such request had been filed by Oppenheimer with the brand board regarding these cattle.

has created a new tort which did not exist before today.

The acts of the brand inspector in no way resulted in the injury (conversion) of Oppenheimer's cattle. Even when viewing Oppenheimer's allegations in a light most favorable to it, it is clear that any role played by the deputy brand inspector in the chain of causation leading to the alleged conversion was, at best, after the fact and thus too remote to be the proximate cause of such injury. Therefore, no liability will lie against the State Brand Board since the alleged acts of its agent did not cause any "property damage" as that term is defined by I.C. § 6–902(6) and applied in I.C. § 6–926. The district court properly dismissed Oppenheimer's claim against the State Brand Board.[3]

### III

Finally, apart from the issue of causation, I fail to find within the facts of this case anything which would support a finding, as a matter of law, that an action in negligence lies in favor of Oppenheimer, a third party to the brand inspection, against the State Brand Board. I know of no law in this state which would establish such a cause of action. The State Brand Board owes no duty to protect Oppenheimer against loss, damage or theft of its cattle by third parties. The mere fact that the brand regulations in question result in an indirect benefit to all members of the public dealing with the cattle or livestock trade does not in and of itself create a cause of action in Oppenheimer for any alleged failure to protect him against loss or theft of his cattle. In *Sterling v. Bloom,* 111 Idaho 211, 723 P.2d 755 (1986), this Court held that an action would lie in tort in favor of a third party (Sterling) who was injured as a result of the negligent conduct of the state *with regard to an individual entrusted to*

*the state's charge.* In *Sterling,* the Court based the existence of a cause of action upon the Restatement (Second), Torts §§ 315, 319. However, in the present case, it is clear that Restatement (Second), Torts, § 319, does not apply. Neither statute nor regulation imposes upon the State Brand Board or the brand inspector any responsibility or duty to supervise feedlot operations such as the one involved in the present case. In short, I fail to see any basis in the law or facts of this case for asserting that the state was under a duty to protect Oppenheimer against the loss or theft of its cattle.

SHEPARD, J., concurs.

### ON DENIAL OF PETITION FOR REHEARING

HUNTLEY, Justice.

The petition for rehearing by the board asserts one issue we wish to address, that being that "there was no relationship between Oppenheimer, Bolen Cattle Co., and the brand board giving rise to any duty on the part of the brand inspector toward Oppenheimer." This assertion ignores the basis upon which liability exists in this case, namely IDAPA 11.02.3, which reads:

IDAPA 11.02.3. Fresh brands on cattle, horses, mules and asses bearing older brands shall not be accepted as proof of ownership unless accompanied by a brand inspection certificate or bill of sale covering older brands. (a) The state brand inspector may inquire into the ownership of all livestock bearing two or more brands.

We take this opportunity to clarify that liability in this case is solely premised upon IDAPA 11.02.3. Our opinion states that "[w]hile a state brand inspector *may* exer-

---

**3.** It appears that the majority asserts that Oppenheimer's damage results from loss of possession of his property. If the majority's characterization of Oppenheimer's claim is correct, then it is clear beyond cavil that the alleged conduct of the deputy brand inspector had nothing at all to do with Oppenheimer's claim for damages. Technically speaking, Oppenheimer is himself

to blame for loss of possession of his cattle. Possession was relinquished voluntarily to Bolen. It is not the responsibility of the State Brand Board to act as guarantor to feedlot operations. Oppenheimer himself remains primarily responsible for monitoring the acts of those to whom he has entrusted possession of his cattle.

cise discretion in deciding whether to inquire into the ownership of livestock bearing *two or more brands,* the appearance of a *"fresh"* brand *mandates* that the same inspector *shall not* accept such a brand as proof of ownership...." At 425, 732 P.2d at 663. We do not imply that the brand inspector, by virtue of the "discretion" granted him by IDAPA 11.02.3 is, in some way, a "planner." A brand inspector has, and presumably always will, act "operationally" in accordance with a policy or plan. Here, the "plan" (IDAPA 11.02.3) allowed for "discretion" in certain instances (where there are two or more brands) and none in others (where fresh brands are present). Although semantically confusing, the "discretion" allowed brand inspectors as to whether to inquire into ownership of cattle with two brands is not at all analogous to the "discretion" excepted from liability under I.C. § 6-904(1) of the Idaho Tort Claims Act, otherwise known as the "discretionary function" exemption.

■ We also use this opportunity to clarify an argument put forth in part II of Justice Bakes' dissent. Justice Bakes contends that the brand inspector's actions were not the proximate cause of Oppenheimer's injuries, as the injuries stemmed from *Bolen's* conversion of the cattle. This argument misses the point—specifically, that Oppenheimer complains of the brand inspector's *negligent inspection* of the cattle as leading to the subsequent conversion.

The argument also fails to account for the most obvious and controlling authority on situations such as the instant one, where a third party is involved in the injury to the plaintiff—*Doe v. Durtschi,* 110 Idaho 466, 716 P.2d 1238 (1986). In *Durtschi,* Justice Bakes argued that the essence of the plaintiffs' claims was premised on Durtschi's sexual assault and battery on the children, just as he now argues that "[t]he essence of Oppenheimers' claim for damages is premised upon the tort of conversion." Justice Bakes then states that the brand inspector had not "committed any of the traditional acts of conversion

which our prior cases have recognized." Thus, the brand inspector's actions were not the proximate cause of Oppenheimer's loss.

The response to this argument in *Durtschi* is equally appropriate in this case and deserves quotation in its entirety:

Under the plaintiffs' allegations, the children's injuries arose out of the basic negligence of the school district. The injuries were the foreseeable consequence of the school district's negligence in retaining Durtschi despite full knowledge of his proclivities.

The fact that the plaintiffs' injuries were caused by a third party does not absolve the school district from liability for its negligence. The concept of supervening causation is inapplicable, under the allegations of the present case. Durtschi's actions were the foreseeable result of the school district's alleged failure to exercise due care to protect its students. The very risk which constituted the district's negligence was the probability that such actions might occur.

It is clearly unsound to afford immunity to a negligent defendant because the intervening force, the very anticipation of which made his conduct negligent, has brought about the expected harm. *Gibson v. United States,* 457 F.2d 1391, 1395 (3d Cir.1972). To do so would fly in the face of basic principles of tort law, as recounted in the Restatement:

If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal, does not prevent the actor from being liable for harm caused thereby.

Restatement (Second) of Torts, § 449. See *Smith v. Sharp,* 82 Idaho 420, 428, 354 P.2d 172, 176 (1960).

The fact that the foreseeable danger was from intentional or criminal misconduct is irrelevant; the school district had a statutory duty to make reasonable efforts to protect its students

from such a danger. A breach of that duty constitutes negligence. Under the allegations of the present case, Durtschi's actions would not constitute as supervening cause, and the school district's tortious conduct would not arise out of the assault and battery. Rather, the root of the assault and battery would be in the district's own negligence. *Durtschi*, 110 Idaho at 471–72, 716 P.2d at 1243–44.

Oppenheimer's allegations, like those in *Durtschi*, arose out of the negligence of the brand inspector during the inspection of the cattle, not out of any alleged conversion.

The action of Bolen in this case, like the action of Durtschi, was "the foreseeable result of the [brand inspector's] alleged failure to exercise due care.... The very risk which constituted the [brand inspector's] negligence was the probability that such actions might occur." *Durtschi*, 110 Idaho at 472, 716 P.2d at 1244. On the solid authority of supporting case law the Court concluded that when the third party's actions were the foreseeable result of the tortfeasor's own negligence, those actions do not constitute supervening causation. *Id.* In this case, the foreseeable result of the brand inspector's allegedly lax performance was that fraudulently rebranded cattle would be transferred. The roots of the conversion of Oppenheimer's cattle were in the brand inspector's alleged negligence.

The further argument, that IDAPA 11.-02.3 fails to define those to whom the brand inspector's duty is owed is addressed in *Sterling v. Bloom*, 111 Idaho 211, 723 P.2d 755 (1986).

> While the statute does not purport to identify by *name* or class those to whom that assigned duty is owed, in the instant circumstances, obvious to the utmost, the motorists foreseeably endangered by the negligent supervision of Bloom are within the class protected. *Id.*, 723 P.2d at 768. (Footnote and citations omitted; emphasis in original).

Here, cattle ranchers, like Oppenheimer, who rely on the brand inspectors to do their jobs, are within the class protected.

Obviously, the brand inspector did not supervise Bolen in the same fashion that the state supervised Durtschi and Bloom. However, at the time of inspection, the brand inspector had the authority and duty to insure that Bolen had not fraudulently rebranded someone else's cattle. This he allegedly failed to do, despite the regulatory directive that such brands "shall not be accepted as proof of ownership unless accompanied by a brand inspection certificate or a bill of sale covering older brands." The reasoning of *Durtschi* applies here. One whose negligence brings about harm at the hands of a third party is liable for that harm.

For the foregoing reasons, the petition for rehearing is denied.

DONALDSON and BISTLINE, JJ., concur.

SHEPARD, Chief Justice, and BAKES, Justice, dissenting:

The majority's opinion on denial of petition for rehearing purportedly relies on this Court's recent decision in *Doe v. Durtschi*, 110 Idaho 466, 716 P.2d 1238 (1986), to support its decision in this case. However, *Durtschi* is readily distinguishable from the present case. In *Durtschi*, the alleged negligence of the school district occurred several months before Durtschi's tortious acts, and was allegedly what made possible the injury inflicted by Durtschi upon the plaintiffs in that case. However, in the present case the rebranding and selling of Oppenheimer's cattle by Bolen occurred prior to any alleged negligent inspection by the deputy brand inspector. It is clear that *Durtschi* is totally inapposite to the present case.

The majority opinion on denial of petition for rehearing, however, goes much further than the holding in the initial opinion in this case. The opinion on rehearing, without citing any authority for the proposition, now holds that the "brand inspector had the ... *duty to insure* that Bolen had not

fraudulently rebranded someone else's cattle." While it is a proper role of government to protect its citizens from unlawful conduct of individual members of society *via* the law enforcement and police powers of the state, government does not have a "duty to insure" against damage caused by the unlawful conduct of third parties. Government was never intended to be an "insurer" or guarantor of the safety of the person or property of the general public.

In the past few months today's majority, by its interpretation of the Idaho Tort Claims Act, has taken the Court, and indeed the state, on a path which is leading toward total governmental responsibility for any injury to any person. The majority has overruled the cases of *Dunbar v. United Steelworkers of America,* 100 Idaho 523, 602 P.2d 21 (1979), and *Chandler Supply Co., Inc. v. City of Boise,* 104 Idaho 480, 660 P.2d 1323 (1983). More critically, however, after eliminating much of the immunity contained in the Tort Claims Act, the Court has then created new torts which never existed before and which were never contemplated by the legislature when it enacted the Tort Claims Act. *See Sterling v. Bloom,* 111 Idaho 211, 723 P.2d 755 (1986); *Jones v. City of St. Maries,* 111 Idaho 733, 727 P.2d 1161 (1986); *Lewis v. Estate of Smith,* 111 Idaho 755, 727 P.2d 1183 (1986). Today in its opinion on denial of petition for rehearing, the majority goes one giant step further by now holding that the state has a responsibility to "insure" against the tortious acts of private individuals. There is no justification either in the common law or in the statutes for such an expansion of tort liability.

When the consequences of the language in today's opinion on denial of rehearing fully materialize, the resulting fiscal obligation which it will impose upon both state and local governmental units will inevitably cause a major shift of government funding away from other essential government services, such as education and health and welfare, to meet the new tort responsibility created by today's opinion. While the legislature has limited the amount to which a governmental unit can be held liable in tort, I.C. § 6–926, such limits still impose a significant burden upon the smaller governmental units found in the state, such as school districts and the smaller cities and counties of the state. However, it is the rapid expansion of the circumstances giving rise to liability, as much as the excessive amount of the claims awarded, which is creating the tort law crisis which the state faces today. Governmental entities such as cities and school districts certainly do not have the ability to self-insure against such risks, and many governmental units are finding that insurance from the private sector is entirely unavailable or prohibitively expensive. Furthermore, it is important to note that the limitation on the amount recoverable as damages in I.C. § 6–926 does not in any way limit the litigation costs in defending such suits, which costs are themselves a huge burden on the operation of government, often exceeding the ultimate liability imposed.